230 P.3d 382

Ralph Hart FISHER, Sally W. Fisher, Carla N. Jordan, Catherine Anne Moore–Airth, Guy St. Clair Combs, Robert B. Jordan, Michael T. Jordan, Kristen J. La Dow, Anthony Hart Fisher, Jonathan Fisher, Timothy Wilcox Fisher, Scott Michael St. Clair Combs Trust, Martha Combs Trust, Marian Wilcox Combs, and Guy St Clair Combs III Irrevocable Trust, Plaintiffs–Appellants/Cross–Appellees,

and

Keith Tsukamoto and Michael Sheehan, Plaintiffs–Cross–Appellants/Cross–Appellees,

v.

The GROVE FARM COMPANY, INCORPORATED, a Hawai'i corporation, ALPS Acquisition Sub, Inc., Hugh W. Klebahn, Daniel H. Case, and Does 1–10, Defendants–Appellees/Cross–Appellees,

and

Donn A. Carswell, Pamela W. Dohrman, Robert D. Mullins, William D. Pratt, and Randolph G. Moore, Defendants–Appellees/Cross–Appellants/Cross–Appellees

and

Keith Tsukamoto, Ralph Hart Fisher, Sally W. Fisher, Carla N. Jordan, Catherine Anne Moore–Airth, Guy St. Clair Combs, Robert B. Jordan, Michael T. Jordan, Kristen J. La Dow, Anthony Hart Fisher, Jonathan Fisher, Timothy Wilcox Fisher, Michael Sheehan, Scott Michael St. Clair Combs Trust, Martha Combs Trust, Marian Wilcox Combs, and Guy St Clair Combs III Irrevocable Trust, Plaintiffs–Appellants,

v.

The Grove Farm Company, Incorporated, a Hawai'i corporation, ALPS Acquisition Sub, Inc., Hugh W. Klebahn, Donn A. Carswell, Pamela W. Dohrman, Robert D. Mullins, William D. Pratt, Randolph G. Moore, Daniel H. Case, and Does 1–10, Defendants–Appellees.

Nos. 28626, 28772.

Intermediate Court of Appeals of Hawai'i.

Dec. 29, 2009.

Damon M. Senaha, Matthew H. Simmons, on the briefs, for Plaintiffs–Appellants/Cross–Appellees.

Richard E. Wilson, Honolulu, on the briefs, for Plaintiffs–Cross–Appellants/Cross–Appellees Keith Tsukamoto and Michael Sheehan.

Corey Y.S. Park, Pamela W. Bunn (Paul Johnson Park & Niles), Honolulu, on the briefs, for (1) Defendants-Appellees/Cross-Appellants/Cross-Appellees Don A. Carswell, Pamela W. Dohrman, Robert D. Mullins, William D. Pratt, and Randolph G. Moore on the Opening Brief in Their Cross–Appeal; and (2) Defendants–Appellees/Cross–Appellees The Grove Farm Company, Incorporated and Hugh W. Klebahn, and Defendants–Appellees/Cross–Appellants/Cross–Appellees Don A. Carswell, Pamela W. Dohrman, Robert D. Mullins, William D. Pratt, and Randolph G. Moore on the Answering Brief for Tsukamoto and Sheehan's Appeal.

Gary G. Grimmer, Steven M. Egesdal, John P. Dobrovich Jr. (Carlsmith Ball LLP), Honolulu, on the briefs, for Defendant–Appellee Daniel H. Case.

WATANABE, Presiding J., FOLEY, J., and Circuit Judge AHN, in Place of NAKAMURA, C.J., FUJISE and LEONARD, JJ., All Recused.

### Opinion of the Court by FOLEY, J.

These consolidated appeals stem from a challenge by minority shareholders to a December 1, 2000 acquisition of cash-strapped Defendant–Appellee/Cross–Appellee Grove Farm Company, Incorporated (Grove Farm) by Defendant–Appellee/Cross–Appellee ALPS Acquisition Sub, Inc. (ALPS Acquisition or ALPS), a company owed by Stephen M. Case (Stephen Case), the son of Defendant–Appellee Daniel H. Case (Daniel Case), a partner in the Hawai‘i law firm of Case Bigelow & Lombardi (CB & L).

In Appeal No. 28626:

(1) Plaintiffs–Appellants/Cross–Appellees Ralph Hart Fisher, Sally W. Fisher, Carla N. Jordan, Catherine Anne Moore–Airth, Guy St. Clair Combs (Combs), Robert B. Jordan, Michael T. Jordan, Kristen J. La Dow, Anthony Hart Fisher, Jonathan Fisher, Timothy Wilcox Fisher, Scott Michael St. Clair Combs Trust, Martha Combs Trust, Marion Wilcox Combs, and Guy St. Clair Combs III Irrevocable Trust (collectively, Shareholders) appeal from the Amended Final Judgment (Amended Final Judgment) filed on June 1, 2007 in the Circuit Court of the Fifth Circuit (circuit court)[1];

(2) Plaintiffs–Cross–Appellants/Cross–Appellees Keith Tsukamoto (Tsukamoto) and Michael Sheehan (Sheehan)[2] (collectively, Tsukamoto Shareholders) cross-appeal from the Amended Final Judgment; and

(3) Defendants–Appellees/Cross–Appellants/Cross–Appellees Donn A. Carswell (Carswell), Pamela W. Dohrman (Dohrman),

Robert D. Mullins (Mullins), William D. Pratt (Pratt), and Randolph G. Moore (Moore) (collectively, Cross–Appellants) cross-appeal from the Amended Final Judgment.

In the Amended Final Judgment, the circuit court

(1) entered judgment in favor of Daniel Case and against Shareholders and Tsukamoto Shareholders (both classes collectively hereinafter, Plaintiffs) on Counts VI and VII of the Second Amended Complaint, pursuant to the circuit court's January 30, 2006 order granting Daniel Case's motion for summary judgment and the March 28, 2006 order denying Shareholders' motion for reconsideration of the January 30, 2006 order;

(2) entered judgment in favor of Grove Farm, for itself and as successor to ALPS Acquisition (Grove Farm and ALPS Acquisition collectively, Grove Farm Company), and against Plaintiffs on all claims raised in the Second Amended Complaint, pursuant to the circuit court's July 29, 2004 order granting Grove Farm Company's motion for judgment on the pleadings and July 25, 2006 order denying Tsukamoto Shareholders' motion for reconsideration of the July 29, 2004 order;

(3) dismissed all claims brought by Tsukamoto in the Second Amended Complaint;

(4) entered judgment in favor of Defendant–Appellee/ Cross–Appellee Hugh W. Klebahn (Klebahn) and Cross–Appellants (Klebahn and Cross–Appellants collectively, Former Directors) and against Sheehan on Counts V and VI of the Second Amended Complaint, pursuant to the circuit court's November 21, 2006 "Order Granting [Former Directors'] Motion for Judgment as a Matter of Law Re: Fraud and Conspiracy to Defraud";

(5) entered judgment in favor of Former Directors and against Sheehan on Count VIII of the Second Amended Complaint, pursuant to the circuit court's November 21, 2006 "Order (1) Granting [Former Directors']

---

1. The Honorable Kathleen N.A. Watanabe presided.

2. At the time the Second Amended Complaint was filed, Plaintiffs Tsukamoto, Sheehan, and Shareholders were all represented by the same counsel. On November 30, 2005, Shareholders retained separate counsel. On April 19, 2006, pursuant to Tsukamoto and Sheehan's request, the circuit court severed their claims from those of the Shareholders.

Motion for Judgment as a Matter of Law Re: Punitive Damages and (2) Denying in Part [Sheehan's] Motion to Conduct Discovery Relevant on the Issue of 1) Punitive Damages and 2) Rescissory Damages" and November 28, 2006 "Order Denying [Sheehan's] Motion for Reconsideration of November 13, 2006 Oral Ruling Granting [Former Directors'] Motion for Judgment as a Matter of Law Re: Punitive Damages"; and

(6) entered judgment in favor of Former Directors and against Sheehan on Counts I, II, III, and IV of the Second Amended Complaint, pursuant to the Jury's Special Verdict Form.

In Appeal No. 28772, Plaintiffs appeal from the circuit court's September 6, 2007 Judgment on Taxation and Assessment of Costs, in which the circuit court entered judgment in favor of Daniel Case and against Plaintiffs, pursuant to a July 19, 2007 order granting Daniel Case's motion for taxation of costs.

## I.

Cross–Appellants argue that the circuit court erred by granting Tsukamoto Shareholders' June 1, 2006 Motion for Partial Summary Judgment on the Business Judgment Rule and Count III of the Second Amended Complaint (Business Judgment Rule Motion). Cross–Appellants ask this court to reverse the July 26, 2006 order (the 7/26/06 Order) and the September 13, 2006 amended order (Amended Order) granting the Business Judgment Rule Motion.

Shareholders and Tsukamoto Shareholders both claim the circuit court erred by (1) dismissing Daniel Case as a defendant and (2) awarding costs to Daniel Case and Former Directors.

Tsukamoto Shareholders also contend the circuit court erred in

(1) granting Former Directors' "Motion in Limine No. 2—to Exclude Evidence and Argument Re: the Court's Granting Plaintiffs' Motion for Partial Summary Judgment on the Business Judgment Rule" (Motion in Limine No. 2) and "Motion in Limine No. 9—to Exclude (1) References to the Assertion of Attorney Client Privilege and (2) Questions that Are Likely to Elicit an Assertion of Attorney–Client Privilege" (Motion in Limine No. 9), both filed on September 8, 2006;

(2) rejecting Sheehan's request to instruct the jury on the facts established at summary judgment that Grove Farm Company and Former Directors failed to exercise due care and act with informed judgment;

(3) granting Former Directors' Motion for Judgment as a Matter of Law [ (JMOL) ] Re: Punitive Damages (JMOL Motion Re Punitives) and Motion for [JMOL] Re: Fraud and Conspiracy to Defraud (JMOL Motion Re Fraud/Conspiracy), both filed on November 13, 2006;

(4) dismissing Tsukamoto's claims on the eve of trial;

(5) granting Former Directors' September 20, 2006 Motion for Leave to File Amended Answer (Motion to Amend Answer);

(6) dismissing Grove Farm Company as a defendant;

(7) denying Plaintiffs' May 21, 2004 Motion to Compel Production of Documents (Motion to Compel);

(8) denying Tsukamoto Shareholders' April 12, 2006 motion to set aside the Discovery Master's order granting in part Former Directors' motion for a protective order (Motion to Set Aside);

(9) denying Tsukamoto Shareholders' July 24, 2006 Motion to Conduct Discovery Relevant to Rescissory Damages (Rescissory Damages Discovery Motion);

(10) entering final judgment in favor of Former Directors on Count III of the Second Amended Complaint;

(11) granting Daniel Case's June 14, 2007 Motion for Taxation of Costs (Case's Costs Motion), while denying Sheehan's June 8, 2007 Motion for Taxation of Costs (Sheehan's Costs Motion); and

(12) denying Sheehan's June 8, 2007 Motion for New Trial (Motion for New Trial).

Shareholders request that we reverse the circuit court's rulings on each of Shareholders' points of error.

Tsukamoto Shareholders request the following:

[T]he judgment and costs awards should be vacated, and this matter remanded to the [circuit] court. The dispositive orders dismissing Grove Farm [Company] and [Daniel Case] should be vacated, as well as the order dismissing [Tsukamoto]. The order granting [JMOL] on the fraud, conspiracy and punitive damages claim[s] should also be vacated. Prior to the retrial, [Tsukamoto Shareholders] should be allowed to conduct discovery regarding all Appellees' [sic] net worth and rescissory damages. Finally, [Tsukamoto Shareholders] should be permitted to inform the jury of the facts established a[sic] summary judgment (failure to exercise due care and act with informed judgment) and that the [Former Directors] were not relying on their attorneys.

If this Court affirms the [circuit] court in all pretrial and trial matters, it should nevertheless vacate the Amended Final Judgment, enter judgment on Count III in [Tsukamoto Shareholders'] behalf, vacate the [order granting Case's Costs Motion], and order that the [circuit] court entertain a motion for costs from [Tsukamoto Shareholders].

## II.

We summarized the underlying facts in this case in a related case, *Sheehan v. Grove Farm Co.*, 114 Hawai'i 376, 379–82, 163 P.3d 179, 182–85 (App.2005):

> In the 1990s, Grove Farm, a Hawai'i corporation with land holdings and operations on the Island of Kaua'i, encountered financial difficulties: it had accumulated a debt in excess of $62 million, the economy of Kaua'i was in recession, a shopping center owned by Grove Farm required repairs costing several million dollars, and home sales had stalled. By 1999, Grove Farm was operating at a loss, and Klebahn, the Chairman and Chief Executive Officer (CEO) of Grove Farm, advised the stockholders that Grove Farm required substantial amounts of cash in the near term and Grove Farm did not have the capital resources to meet those needs.
>
> In December 1999, Grove Farm received a letter of intent from Scott Blum (Blum), Klebahn's son-in-law, to purchase all outstanding shares of Grove Farm stock for $125 per share. A Special Committee of outside and disinterested directors [including Cross-Appellants] was appointed by the Board of Directors to review and respond to the proposal.
>
> One of the terms of Blum's letter of intent was that the letter be submitted for preliminary approval by the stockholders and that the holders of at least 75% of the shares vote for approval of the sale. On January 21, 2000, a special meeting of stockholders was held. The stockholders of only two-thirds of the outstanding shares voted in favor of proceeding with the offer. Because Blum did not receive approval from 75% of the stockholders, Blum's letter of intent terminated by its own terms. However, the stockholders of 88% of the shares showed a willingness to consider selling under the right circumstances. Blum indicated he would consider resubmitting his proposal if an arrangement could be worked out to assure 75% stockholder approval. Since the stockholders had showed a willingness to sell, the Board of Directors retained the Special Committee to review and evaluate the strategic alternatives available to Grove Farm and to make recommendations to the Board.
>
> After presentations from three firms, the Special Committee hired Aspen Venture Group (Aspen) as a financial advisor for Grove Farm. Aspen advanced four alternatives: (1) orderly liquidation of Grove Farm, (2) restructuring of debt and a commitment to continued short-term development, (3) status quo, and (4) the sale of all or substantially all of the corporate assets to a single buyer or the sale of 100% of the Grove Farm stock. The Special Committee eventually determined the best option was to sell Grove Farm as a whole. Aspen determined the fair market value of Grove Farm's common stock to be in the range of $86 to $98 per share. The Special Committee authorized Moore to contact other parties that had previously expressed interest in Grove Farm.

On May 8, 2000, the stockholders' annual meeting was held. At the meeting, [Combs] was elected as a director.... Moore reported on the Special Committee's activities. Aspen presented the results of its valuation study and its analysis of Grove Farm's alternatives to the stockholders. The Special Committee received input from several stockholders concerning the stockholders' concerns and suggestions.

After the annual meeting, the Special Committee reviewed a draft letter of intent from Blum. The Committee determined there were several major issues that needed resolution and directed counsel to discuss the issues with Blum's counsel.

On May 26, 2000, the Special Committee met to review Blum's draft merger agreement. The Committee again determined there were unresolved issues and directed counsel to discuss these issues with Blum's counsel. Moore reported that other parties had indicated an interest in submitting a proposal to purchase Grove Farm. One of the interested parties, Honu Group, Inc. (Honu), had sent a letter of interest dated May 23, 2000. The letter included terms of $130 per share, subject to due diligence, and an alternative of stockholders receiving land in lieu of cash for shares. Lehman Brothers had also sent a letter stating that it had entered into a joint venture with Honu to acquire Grove Farm.

The Special Committee decided to contact each party and to provide "due diligence" materials to the parties who signed a confidentiality agreement and provided evidence of financial ability. The Special Committee would advise the parties that they would have until July 10, 2000 to submit a proposal and that the Committee's intent was to negotiate a definitive agreement by July 24, 2000.

On June 5, 2000, Honu met with the Special Committee and reviewed with the Committee the terms of the May 23, 2000 letter. On July 19, 2000, Honu submitted a letter of intent with an offer of $136 per share, a program of offering land to stockholders, and, subject to a review of applicable securities law, offering stockholders the possibility to continue as stockholders post-merger.

The Committee also received proposals from other potential buyers and, after reviewing the proposals submitted, determined that Honu provided the best value to the stockholders. On July 20, 2000, the Board of Directors authorized Moore to accept Honu's letter of intent, subject to a few clarifications.

After the Special Committee received another proposal from one of the potential buyers, Honu submitted an August 1, 2000 addendum, in which Honu increased the purchase price to $140 per share and required Grove Farm to cease discussions with other parties for up to 45 days during negotiations with Honu. The Special Committee reviewed the revised proposals (of Honu and the other interested party) and recommended that the Board of Directors accept the Honu proposal. The Board of Directors reviewed the two proposals and authorized Moore to sign the Honu letter of intent, as modified by the addendum.

Honu, the Special Committee, and Grove Farm began negotiations on a definitive merger agreement and related disclosure schedules. In the midst of negotiations, Lehman Brothers sent a letter to Grove Farm indicating that, contrary to the earlier letter, it had not entered into a joint venture with Honu to buy Grove Farm. Thereafter, the Special Committee advised Honu that evidence of its ability to perform would be required as well as certain other conditions and modifications to the merger agreement. Honu did not provide adequate evidence of its ability to finance the acquisition, and Honu and Grove Farm did not reach an agreement with respect to the terms of the merger agreement. Honu's letter of intent expired on its own terms.

The Special Committee consulted with counsel and decided Grove Farm should notify interested parties that the Honu negotiations had terminated. The Special Committee also determined that since Blum was no longer interested in acquiring Grove Farm, the Committee was no longer needed and was dissolved and the Board of

Directors would handle any future sale proceedings.

Thereafter, the Board of Directors decided that a sale of Grove Farm was still the best option. However, timing was a key consideration because Grove Farm had substantial principal payments due at the end of the year and funding for various projects could not be deferred indefinitely. Pursuant to its decision to sell Grove Farm, the Board sent letters to previously and potentially interested parties.

On September 19, 2000, [Daniel Case], of [CB & L], Grove Farm's corporate counsel, indicated to Klebahn that his son, [Stephen Case], was interested in submitting a proposal. [Daniel Case] asked that Grove Farm waive any potential conflict of interest relative to his involvement as personal representative of Stephen Case and the continued representation of Grove Farm by [CB & L]. [Daniel Case] stated that he would not be involved in [CB & L's] representation of Grove Farm during the merger proceedings. At the September 22, 2000 meeting of the Board of Directors, Klebahn reported on his discussions with parties that had indicated interest in Grove Farm, including his discussions with [Daniel Case]. The Board agreed to waive any potential conflict of interest and authorized Klebahn to invite Stephen Case to submit a proposal.

Through ALPS Investment LLC (ALPS LLC), a company engaged in general investments and owned by Stephen M. Case Revocable Living Trust, Stephen Case confirmed his interest in submitting a proposal. ALPS LLC was managed by Ka Po'e Hana LLC, of which the president was John Agee [ (Agee) ] and the owners were Mr. and Mrs. Stephen Case. ALPS LLC subsequently entered into negotiations with Grove Farm on the terms of a definitive merger agreement and conducted due diligence.

On October 12, 2000, ALPS LLC executed a definitive Merger Agreement (Merger Agreement) and submitted it to Grove Farm's Board of Directors. The Board met on October 17, 2000 to review the terms of the Merger Agreement with coun-sel. The Board approved the Merger Agreement and decided to recommend that the stockholders approve it.

The Merger Agreement provided that [ALPS Acquisition] would merge with and into Grove Farm, with Grove Farm as the surviving corporation. Once the merger was complete, Grove Farm stockholders would be entitled to receive $152 per share. All shares of ALPS Acquisition held by ALPS LLC would be converted into new shares of Grove Farm. After the merger, ALPS LLC would own 100% of the shares of Grove Farm common stock.

On November 3, 2000, the Board of Directors sent out a proxy statement to the stockholders, informing the stockholders of the background and ALPS Acquisition offer and notifying the stockholders of a special meeting on December 1, 2000 to vote on the merger.

Grove Farm sent a letter to its stockholders on November 21, 2000, informing them that it had received two other nonbinding proposals to purchase Grove Farm, but the only written, signed agreement was with ALPS Acquisition. Grove Farm stated that Del Mar Pacific Group, LLC, had initially offered a higher price per share than ALPS Acquisition, but had withdrawn its offer upon learning of the provisions of the Merger Agreement. A second company, Wattson–Breevast, had submitted a letter of intent, and Grove Farm was in negotiations with Wattson–Breevast.

The records of Grove Farm indicate that at the time of the December 1, 2000 stockholders' special meeting there were 171,122 outstanding shares of Grove Farm stock held by 176 stockholders. At the meeting, Klebahn informed the stockholders that Wattson–Breevast had expressed interest in acquiring Grove Farm at $170 per share. The Board had advised Wattson–Breevast of the December 1 meeting, but Wattson–Breevast had not submitted a written offer or deposit prior to the meeting and had asked that the meeting be postponed. Klebahn stated that after reviewing Grove Farm's upcoming financial needs and the failure of Wattson–Breevast

to provide a deposit or written agreement, the Board had decided not to postpone the meeting. Klebahn also informed the stockholders that a lawsuit had been filed by Sheehan.

After questions from the stockholders and discussion, 146 of 176 stockholders approved the merger; these stockholders held 98.9% of the outstanding shares. Including Sheehan, only three stockholders voted against the proposal (27 stockholders did not vote). The other two stockholders who voted against the proposal subsequently tendered their shares and were paid. Sheehan was the only stockholder who voted against the merger who did not tender his shares. Sheehan was the only stockholder who gave written notice to Grove Farm of his intent to demand compensation under Hawaii Revised Statutes (HRS) § 415–81 (1993).

(Footnotes omitted.)

## III.

### A. Summary Judgment

On appeal, the grant or denial of summary judgment is reviewed de novo. *See State ex rel. Anzai v. City and County of Honolulu*, 99 Hawai'i 508, 51[5], 57 P.3d 433, 4[40] (2002); *Bitney v. Honolulu Police Dep't*, 96 Hawai'i 243, 250, 30 P.3d 257, 264 (2001).

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to [JMOL]. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Kahale v. City and County of Honolulu*, 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004) (citation omitted).

*Nuuanu Valley Assoc. v. City & County of Honolulu*, 119 Hawai'i 90, 96, 194 P.3d 531, 537 (2008).

### B. Motion In Limine

■ "The granting or denying of a motion in limine is reviewed for abuse of discretion." *Miyamoto v. Lum*, 104 Hawai'i 1, 7, 84 P.3d 509, 515 (2004) (internal quotation marks, citation, and ellipsis omitted). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

### C. Motion for Reconsideration

■ [T]he purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion. Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding.

*Ass'n of Apt. Owners of Wailea Elua v. Wailea Resort Co.*, 100 Hawai'i 97, 110, 58 P.3d 608, 621 (2002) (quoting *Sousaris v. Miller*, 92 Hawai'i 505, 513, 993 P.2d 539, 547 (2000)). We review a "trial court's ruling on a motion for reconsideration ... under the abuse of discretion standard." *Ass'n of Apt. Owners of Wailea Elua*, 100 Hawai'i at 110, 58 P.3d at 621. An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc.*, 74 Haw. at 114, 839 P.2d at 26.

### D. JMOL Motion

■ It is well settled that a trial court's rulings on [JMOL motions] are reviewed *de novo*.

When [the appellate court reviews] the granting of a [JMOL motion], [the appellate court applies] the same standard as the trial court.

A [JMOL motion] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

*Miyamoto v. Lum,* 104 Hawai'i 1, 6–7, 84 P.3d 509, 514–[15] (2004) (internal citations omitted).

*Aluminum Shake Roofing, Inc. v. Hirayasu,* 110 Hawai'i 248, 251, 131 P.3d 1230, 1233 (2006).

**E. Jurisdiction—Civil**

■ The existence of jurisdiction is a question of law that we review de novo under the right/wrong standard. Questions regarding subject matter jurisdiction may be raised at any stage of a cause of action. When reviewing a case where the circuit court lacked subject matter jurisdiction, the appellate court retains jurisdiction, not on the merits, but for the purpose of correcting the error in jurisdiction. A judgment rendered by a circuit court without subject matter jurisdiction is void.

*Lingle v. Hawai'i Gov't Employees Ass'n, AFSCME, Local 152,* 107 Hawai'i 178, 182, 111 P.3d 587, 591 (2005) (quoting *Amantiad v. Odum,* 90 Hawai'i 152, 158–59, 977 P.2d 160, 166–67 (1999)).

**F. Grant/Denial of Motion to Dismiss**

■ A trial court's grant or denial of a motion to dismiss for "lack of subject matter jurisdiction is a question of law, reviewable *de novo.*" *Norris v. Hawaiian Airlines, Inc.,* 74 Haw. 235, 239, 842 P.2d 634, 637 (1992), *aff'd, Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). In *Norris,* the Hawai'i Supreme Court adopted the view of the [United States Court of Appeals for the Ninth Circuit (Ninth Circuit) ] in *Love v. United States,* 871 F.2d 1488, 1491 (9th Cir .1989), *opinion amended on other grounds and superseded by Love v. United States,* 915 F.2d 1242 (9th Cir.1989), that

review of a motion to dismiss for lack of subject matter jurisdiction is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Norris,* 74 Haw. at 240, 842 P.2d at 637 (internal quotation marks, citation, and brackets omitted). "However, when considering a motion to dismiss pursuant to [Hawai'i Rules of Civil Procedure (HRCP) ] Rule 12(b)(1) the trial court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *Norris,* 74 Haw. at 240, 842 P.2d at 637 (internal quotation marks, citation, and brackets in original omitted; bracketed material added).

*Sheehan,* 114 Hawai'i at 389, 163 P.3d at 192.

**G. Harmless Error**

Hawaii Rules of Evidence (HRE) Rule 103(a) provides in relevant part: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."

**H. Motion to Compel Discovery**

■ We review a trial court's ruling limiting the scope of discovery under the abuse of discretion standard. *State v. Fukusaku,* 85 Hawai'i 462, 477–78, 946 P.2d 32, 47–48 (1997).

**I. Judgment on the Pleadings**

■ An HRCP Rule 12(c) (2004) [FN] motion serves much the same purpose as an HRCP Rule 12(b)(6) (2004) motion, *i.e.,* motion to dismiss for "failure to state a claim upon which relief can be granted," except that it is made after the pleadings are closed. *Baehr v. Lewin,* 74 Haw. 530, 545–46, 852 P.2d 44, 52, *reconsideration granted in part and denied in part,* 74 Haw. 650, 875 P.2d 225 (1993) (citation omitted). "A Rule 12(c) motion for a judg-

ment on the pleadings only has utility when all material allegations of fact are admitted in the pleadings and only questions of law remain." *Id.* at 546, 852 P.2d at 52 (citation, internal quotation marks, and ellipsis omitted).

> In a motion for judgment on the pleadings under HRCP Rule 12(c), the movant must clearly establish that no material issue of fact remains to be resolved and that he or she is entitled to [JMOL]. In considering a motion for judgment on the pleadings, the circuit court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.

*Ruf v. Honolulu Police Dep't,* 89 Hawai'i 315, 319, 972 P.2d 1081, 1085 (1999) . . . (citations and internal quotation marks omitted). On appeal, [the appellate] court reviews *de novo* the circuit court's order granting the motion. *Id.* (citation omitted).

> Ultimately, our task on appeal is to determine whether the circuit court's order . . . supports its conclusion that the defendant is entitled to [JMOL] and, by implication, that it appears beyond [a] doubt that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief under any alternative theory.

*Baehr,* 74 Haw. at 550, 852 P.2d at 54 (citations omitted).

---

FN HRCP Rule 12(c) provides in relevant part that, "after the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

*Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.,* 113 Hawai'i 77, 90–91, 148 P.3d 1179, 1192–93 (2006) (brackets in original omitted).

**J. Discovery**

The Hawai'i Supreme Court has held that the HRCP

> reflect a basic philosophy that a party to a civil action should be entitled to the disclosure of all relevant information in the pos-

session of another person prior to trial, unless the information is privileged. However, the extent to which discovery is permitted under Rule 26 is subject to considerable latitude and the discretion of the trial court. Thus, the exercise of such discretion will not be disturbed in the absence of a clear abuse of discretion that results in substantial prejudice to a party. Accordingly, the applicable standard of review on a trial court's ruling on a motion to compel discovery, brought pursuant to HRCP Rule 26, is abuse of discretion.

*Hac v. Univ. of Hawai'i,* 102 Hawai'i 92, 100–01, 73 P.3d 46, 54–55 (2003) (internal quotation marks, citations, brackets, and ellipsis omitted).

**K. Grant/Denial of Motion to Amend Answer**

■ "[T]he grant or denial of leave to amend [an answer] under [HRCP] Rule 15(a) is within the discretion of the trial court." *Associated Eng'rs & Contractors, Inc. v. State,* 58 Haw. 187, 218, 567 P.2d 397, 417 (1977).

**L. Costs—HRCP 54(d)**

■ [HRCP Rule] 54(d) provides that, "except when express provision therefore is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs." "The award of taxable cost is within the discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *Bjornen v. State Farm Fire and Cas. Co.,* 81 Hawai'i 105, 107, 912 P.2d 602, 604 (App.1996).

*Wong v. Takeuchi,* 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998) (brackets in original omitted).

■ Whether a cost was unreasonable or unreasonably incurred is a question of law. *Ferrer v. Ngo,* 102 Hawai'i 119, 124, 73 P.3d 73, 78 (App.2003). Questions of law are reviewed upon appeal under the right/wrong standard of review. *Maile Sky Court Co. v. City & County of Honolulu,* 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997).

## IV.

### A. CROSS–APPEAL

 We address the cross-appeal by Cross–Appellants first, as the issue therein impacts a number of our holdings on appeal. Cross–Appellants contend the circuit court erred by granting the Business Judgment Rule Motion because the court lacked authority to grant the motion and the undisputed facts, as set forth in the motion, clearly establish that Cross–Appellants were fully informed when they voted to recommend the ALPS merger, approve the Proxy statement, and hold the December 1, 2000 shareholders' meeting as scheduled.

In Plaintiffs' Second Amended Complaint, Plaintiffs alleged, among other claims, Failure to Exercise Informed Judgment (Count III). Tsukamoto Shareholders, in their Business Judgment Rule Motion, moved for "an order that the business judgment rule has been rebutted, and for partial summary judgment on Count III." Tsukamoto Shareholders maintained that

> each Defendant has to individually satisfy this Court that he or she was sufficiently informed of all of the underlying material facts surrounding the sale of [Grove Farm] to ALPS before casting their vote to commit [Grove Farm]. Based upon their sworn testimony, they have not, cannot, and will not be able to meet their burden on this motion or at trial. Having rebutted the business judgment rule, [Tsukamoto Appellants] are entitled to an order that Defendants will have the burden of proving the "entire fairness" of the transaction at trial.[3]

Against an undisputed fact record, Plaintiffs are also entitled to judgment on Count III that Defendants failed to exercise informed judgment in connection with approving and recommending the ALPS merger to shareholders.

(Citation, footnotes in original, and emphases omitted.)

Count III provides:

### COUNT III—FAILURE TO EXERCISE INFORMED JUDGMENT

. . . .

65. [Former Directors] had a duty to exercise informed judgment in connection with the ALPS' merger. In order to discharge [their] duty, [Former Directors were] required before recommending the ALPS offer to the shareholders to undertake a reasonable investigation and analysis to ensure that its offer (i) was in the best interests of [Grove Farm] and its shareholders, (ii) fair to the shareholders, and (iii) represented the best price per share and terms available under the circumstances.

66. [Former Directors] failed to exercise informed judgment in approving and recommending to shareholders that they approve the ALPS merger. Had the individual [Former Directors] exercised informed judgment, they would have determined that the ALPS offer was neither in the best interests of nor fair to [Grove Farm] and its shareholders because it did not represent the best price per share and terms available under the circumstances.

67. As a result of [Former Directors'] failure to exercise informed judgment, Plaintiffs received less than the full value for their shares.

---

**3.** In *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53 (Del.1989), the Supreme Court of Delaware stated the following with regard to the burden-shifting framework of the business judgment rule:

> As a rule of evidence, it creates a presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company. The presumption initially attaches to a director-approved transaction within a board's conferred or apparent authority in the absence of any evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment. The burden falls upon the proponent of a claim to rebut the presumption by introducing evidence either of director self-interest, if not self-dealing, or that the directors either lacked good faith or failed to exercise due care. If the proponent fails to meet her burden of establishing facts rebutting the presumption, the business judgment rule, as a substantive rule of law, will attach to protect the directors and the decisions they make.

*Id.* at 64 (internal quotation marks and citations omitted).

68. As a result of the foregoing, Plaintiffs have been damaged in an amount which will be proven at trial.

Former Directors filed a memorandum in opposition to the motion.

In the 7/26/06 Order, the circuit court found:

A. The business judgment rule requires a shareholder who challenges a nonself-dealing transaction to prove that the corporate director or officer in authorizing the transaction (1) failed to act in good faith, (2) failed to act in a manner he reasonably believed to be in the best interest of the corporation, or (3) failed to exercise such care as an ordinarily prudent person in a like position would use in similar circumstances, *Lussier v. Mau–Van Development, Inc.,* [4 Haw. App. 359,] 667 P.2d 804, 817 (Haw.App. 1983), and

B. Plaintiffs have rebutted the presumption under the business judgment rule that [Cross–Appellants] were adequately informed in recommending the sale of [Grove Farm] to [ALPS LLC].

IT IS HEREBY ORDERED THAT [the Business Judgment Rule Motion] is GRANTED.

IT IS FURTHER ORDERED THAT [Cross–Appellants] will have the burden at trial of showing that they were adequately informed in recommending the sale of [Grove Farm] to [ALPS LLC].

On August 7, 2006, Cross–Appellants filed a motion for reconsideration of the 7/26/06 Order. Based in large part on *Carr v. Strode,* 79 Hawai'i 475, 904 P.2d 489 (1995), Cross–Appellants argued that the circuit court did not have authority to order summary judgment because the Business Judgment Rule Motion improperly sought "piecemeal adjudication of a claim," i.e., a factual determination that Former Directors failed to exercise informed judgment, which "would advance, but not entirely dispose of" Count III.

The circuit court held a hearing on the motion for reconsideration, and on September 13, 2006, the court filed its Amended Order, which provided in relevant part:

A. The business judgment rule requires shareholders who challenges [sic] a non-self-dealing transaction to prove that the corporate director or officer in authorizing the transaction (1) failed to act in good faith, (2) failed to act in a manner he reasonably believed to be in the best interest of the corporation, or (3) failed to exercise such care as an ordinarily prudent person in a like position would use in similar circumstances. *Lussier v. Mau–Van Development, Inc.,* [4 Haw. App. 359,] 667 P.2d 804, 817 (Haw.App. 1983), and

B. Plaintiffs have rebutted the business judgment rule having demonstrated as a matter of law that [Cross–Appellants] failed to exercise such care as an ordinarily prudent person in a like position would use in connection with the sale of [Grove Farm] to [ALPS LLC], and

C. Plaintiffs have demonstrated as a matter of law that [Cross–Appellants] had a duty to exercise informed judgment and failed to exercise informed judgment in recommending to shareholders that they approve the sale of Grove Farm to [ALPS LLC].

IT IS HEREBY ORDERED THAT [the Business Judgment Rule Motion] is GRANTED.

IT IS FURTHER ORDERED THAT [Cross–Appellants] will have the burden at trial of proving that the sale of [Grove Farm] to [ALPS LLC] was fair to, and in the best interest of, [Grove Farm] and its shareholders.

Cross–Appellants argue that the circuit court lacked authority to grant the Business Judgment Rule Motion "because the Motion did not seek to adjudicate a 'claim' within the meaning of HRCP Rule 56; instead, it 'improperly sought a factual determination wholesale, outside the context of a failed motion under HRCP Rule 56(a) or (b).' [*Carr,* 79 Hawai'i at 492, 904 P.2d at 506]."

HRCP Rule 56 provides in relevant part:

**Rule 56. SUMMARY JUDGMENT**

**(a) For claimant.** A party seeking to recover upon a *claim,* counterclaim, or cross-claim or to obtain a declaratory judg-

ment may move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

**(b) For defending party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof. . . .

. . . .

**(d) Case not fully adjudicated on motion.** If on motion under this rule judgment is not rendered *upon the whole case or for all the relief asked* and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. *It shall thereupon make an order specifying the facts that appear without substantial controversy,* including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

(Emphases added.)

In *Carr,* Robin Carr (Robin) underwent a failed vasectomy operation, performed by Walter S. Strode, M.D. (Dr. Strode), an employee of Straub Clinic & Hospital, Inc. (Straub). 79 Hawai'i at 477, 904 P.2d at 491. The failed operation resulted in the unplanned birth of a daughter (Daughter). *Id.* at 478, 904 P.2d at 492. Robin, individually and as *prochein ami* of Daughter, and Robin's wife (collectively, the Carrs) claimed that Dr. Strode and Straub failed to obtain Rob-

in's informed consent to perform the operation. *Id.* at 477–78, 904 P.2d at 491–92.

Prior to trial, the Carrs "filed a motion for partial summary judgment limited to a factual finding that Dr. Strode failed to inform [the Carrs] of either the risk of failure or the failure rate associated with a vasectomy." *Id.* at 478, 904 P.2d at 492. The Circuit Court of the First Circuit entered an order regarding the motion, finding that "prior to the vasectomy procedure Dr. Strode failed to specifically state to [Robin] that the vasectomy procedure might fail, and if such failure were to occur that it would or could cause [Robin] to remain fertile or become fertile again in the future." *Id.* at 490–91, 904 P.2d at 504–05 (brackets in original omitted). The court also stated that its order "did not limit any party's right to offer testimony concerning information provided to [Robin] prior to the procedure or the surrounding circumstances thereto at trial." *Id.* at 491, 904 P.2d at 505 (brackets in original omitted). Dr. Strode and Straub cross-appealed from the order granting the summary judgment motion. *Id.* at 490, 904 P.2d at 504.

On appeal, the Hawai'i Supreme Court held that pursuant to *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985),[4] "[Carr's] motion improperly sought a factual determination wholesale, outside the context of a failed motion under HRCP Rule 56(a) or (b)." *Carr,* 79 Hawai'i at 492, 904 P.2d at 506. The supreme court further found that "even if the motion [were] proper, . . . the circuit court erroneously made a finding concerning a material fact in substantial controversy." *Id.* The supreme court stated:

> Under the narrow circumstances surrounding the informed consent inquiry and, because of the similarity between the issue resolved by the circuit court's finding and the ultimate issue in this case, we believe

---

4. The Hawai'i Supreme Court, in citing to *Arado,* stated that HRCP Rule 56(d) was "identical to its federal counterpart"—Federal Rules of Civil Procedure (FRCP) Rule 56(d). *Carr,* 79 Hawai'i at 491, 904 P.2d at 505. In *Arado,* the United States District Court for the Northern District of Illinois, Eastern Division, held that (1) a proper motion under FRCP Rule 56(a) or (b) must seek to adjudicate an entire claim, and (2) if the

motion is improper because it does not, the trial court is without authority to make factual findings pursuant to FRCP Rule 56(d). 626 F.Supp. at 509. The District Court reasoned that "despite Rule 56(a)'s reference to 'all or any part' of a claim, the Rule authorizes only the granting of appealable 'judgments' disposing of entire claims." *Id.* (footnote omitted).

the circuit court's finding amounted to reversible error due to the likelihood that it prejudiced the jury's consideration and resolution of the issue of Dr. Strode's liability on the informed consent claim.

*Id.*

In their Business Judgment Rule Motion, Tsukamoto Shareholders sought (1) a finding that they had rebutted the Business Judgment Rule and (2) partial summary judgment in their favor on Count III.[5] The Business Judgment Rule Motion failed under HRCP Rule 56(a) because it did not seek to dispose of an entire claim, i.e., Count III. HRCP Rule 56(a); *Arado*, 626 F.Supp. at 509. Since the motion failed under HRCP Rule 56(a), Tsukamoto Shareholders' attempt to obtain a factual determination "that [Former Directors] failed to exercise informed judgment in connection with approving and recommending the ALPS merger to the shareholders" was improper, in that Tsukamoto Shareholders sought a factual determination that was "wholesale, outside the context of a failed motion under HRCP Rule 56(a) or (b)." *Carr*, 79 Hawai'i at 492, 904 P.2d at 506.

Given the foregoing, the circuit court erred in granting the Business Judgment Rule Motion in its 7/26/06 Order and Amended Order.

### B. TSUKAMOTO SHAREHOLDERS' APPEAL AND SHAREHOLDERS' APPEAL

#### 1. Motions in Limine Nos. 2 and 9

Tsukamoto Shareholders argue that the circuit court erred in granting Former Directors' Motion in Limine No. 2 and Motion in Limine No. 9.

##### a. Motion in Limine No. 2

■ On September 8, 2006, Former Directors filed Motion in Limine No. 2, in which they requested an order excluding "from trial all evidence, argument and/or any other reference regarding the Court's [7/26/06 Order]." Former Directors explained that

[e]vidence and argument relating to the fact of the Court's July 26 ruling is not relevant for the trier of fact to adjudicate the claims and defenses in this action. In the event that the jury, as opposed to the Court, decides claims that require it to have information regarding the shifting of burdens in connection with the business judgment rule and Count III, that information is more properly communicated to the jury by means of a jury instruction. Lastly, evidence and argument relating to the Court's decision would be unduly prejudicial and poses a danger of confusing the jury.

Tsukamoto Shareholders filed an opposition to Motion in Limine No. 2, and Former Directors filed a reply memorandum. On November 2, 2006, the circuit court filed an order granting Motion in Limine No. 2.

On appeal, Tsukamoto Shareholders argue that they were prejudiced by the circuit court's exclusion of evidence, argument, and/or any other reference regarding the 7/26/06 Order because at trial, Sheehan "essentially had to attempt to retry the facts and convince the jury that the [Former Directors] breached their business judgment rule duties" and was kept from cross-examining Former Directors and one of their witnesses as to whether the transaction had been conducted properly. Tsukamoto Shareholders maintain that evidence showing Former Directors failed to act with due care and informed judgment would have been relevant to the issue of Former Directors' credibility, "their argument that the ALPS deal was the best price and terms," their loyalty, and whether they acted in the best interests of shareholders. Tsukamoto Shareholders contend that "Sheehan was ... placed in the untenable position of being unable to inform the jury that the [Former Directors] breached their collective duties ... when they voted for the ALPS sale and thereafter recommended it to shareholders notwithstanding that summary judgment on those facts had been entered in his favor." (Emphasis omitted.)

---

**5.** Tsukamoto Shareholders alternatively requested "partial summary judgment" and "judgment" on Count III.

Given our holding that the circuit court erred in granting the Business Judgment Rule Motion, the court did not abuse its discretion by granting Motion in Limine No. 2.

### b. Motion in Limine No. 9

On September 8, 2006, Former Directors filed Motion in Limine No. 9, in which they requested an order "excluding from trial (1) all references to the assertion of attorney-client privilege and (2) all questions likely to elicit an assertion of the attorney-client privilege." They argued that

> [t]he only objective to be achieved by referring to that information at trial would be to inflame the jury against the proponent of the privilege by suggesting or implying that the party was acting beyond its rights and improperly concealing evidence. Accordingly, the assertion of attorney-client privilege "is not a proper subject of comment by judge or counsel." HRE Rule 513.

On September 18, 2006, Tsukamoto Shareholders filed an opposition to Motion in Limine No. 9, in which they argued that having asserted the attorney-client privilege, Former Directors were precluded from claiming their actions were reasonable and made with due care. They maintained that since Former Directors had

> the burden of demonstrating without limitation that they acted reasonably and were not reckless in their deliberative process, evidence and testimony that they have asserted the attorney/client privilege regarding all matters except those relating to Wattson–Breevast's SAO is relevant to identify specifically what proof they will in fact be allowed to offer at trial. For each matter which they have asserted the privilege, Plaintiffs will at the appropriate time seek to preclude them from defending their position that their decision was reasonable and made with due care.

(Internal quotation marks omitted.)

On September 28, 2006, Former Directors filed a reply memorandum, in which they argued that HRE Rule 513 flatly prohibited counsel and judges from drawing a negative inference from a party's claim of attorney-client privilege. Former Directors maintained that Tsukamoto Shareholders could not ask them questions at trial that would effectively force them to invoke the attorney-client privilege on behalf of Grove Farm and that in the opposition to Motion in Limine No. 9, Tsukamoto Shareholders appeared

> to request that [Former Directors] be prohibited from testifying that they consulted with counsel. This ignores the clear distinction between offering a defense of reliance on the advice of counsel and offering testimony of *mere consultation* with counsel as one element of good faith. [Former Directors] are permitted to offer evidence that Grove Farm consulted with legal counsel as part of its good-faith efforts, so long as they do not disclose the substance of privileged communications or assert reliance on the advice of counsel as a defense. In considering whether [Former Directors] exercised good faith in connection with the sale of Grove Farm, the jury is entitled to know whether Grove Farm consulted with legal counsel as one element of good faith.
>
> [Tsukamoto Shareholders] further argue that Grove Farm's assertion of the attorney-client privilege somehow dooms [Former Directors'] ability to defend themselves at all. This view, which reduces the hallowed privilege to a trap, essentially consists of two parts: 1) due care requires consultation with counsel; and 2) invocation of the privilege gives rise to a negative inference that [Former Directors] and Grove Farm did not consult with counsel.
>
> The first part is factually inapposite, because it is undisputed that [Former Directors] and Grove Farm did consult with counsel.... [Tsukamoto Shareholders'] first argument is also legally flawed, because due care does not require consultation with counsel.
>
> The second part of [Tsukamoto Shareholders'] summary judgment-like argument is directly contrary to HRE 513, which ... prohibits the drawing of any negative inference based on invocation of privilege.... [W]here the privilege is used to shield discovery into those communications, the party asserting the privilege may

not then introduce evidence of the *substance* of those communications at trial. . . . There is no support in law or logic for [Tsukamoto Shareholders'] extreme position that the privilege thwarts a party's ability to claim reasonableness and good faith.

(Citations omitted.)

On November 2, 2006, the circuit court filed an order denying Motion in Limine No. 9, with the qualification that Former Directors were "entitled to an appropriate jury instruction prohibiting the jury from drawing any inferences from the invocation of the attorney-client privilege."

▓▓▓ On appeal, Tsukamoto Shareholders misconstrue the record and state that the circuit court granted the Motion in Limine No. 9, and much of their argument is premised on that mistake. They also appear to contest the portion of the circuit court's order providing that Former Directors were "entitled to an appropriate jury instruction prohibiting the jury from drawing any inferences from the invocation of the attorney-client privilege" and maintain that the court should have informed the jury that Former Directors' assertion of the privilege precluded Former Directors from asserting a defense that they had relied on the advice of their attorneys and, hence, had acted reasonably and with due care in the ALPS merger.

HRE Rule 513 provides:

**Rule 513 Comment upon or inference from claim of privilege; instructions.** (a) Comment or inference not permitted. The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom.

(b) Claiming privilege without knowledge of jury. In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.

(c) Jury instruction. Upon request, any party exercising a privilege (1) is entitled to an instruction that no inference may be drawn therefrom, or (2) is entitled to have

no instruction on the matter given to the jury. Conflicting requests among multiple parties shall be resolved by the court as justice may require.

Based on the plain language of HRE Rule 513(c), Former Directors were entitled to the circuit court's jury instruction precluding the jury from making any inference based on Former Directors' assertion of the attorney-client privilege. Asking the jury to accept that Former Directors' assertion of the privilege suggested that Former Directors had not relied on the advice of their attorneys and, hence, had not acted reasonably and with due care in the ALPS merger would have been tantamount to asking the jury to make an inference based on Former Directors' assertion of the privilege. The circuit court did not abuse its discretion by denying Motion in Limine No. 9.

**2. Jury Instructions on Due Care and Informed Judgment**

Tsukamoto Shareholders contend the circuit court erred in rejecting Sheehan's request to inform the jury that the court had entered summary judgment and found that Former Directors failed to exercise due care and act with informed judgment. Tsukamoto Shareholders argue that because they were precluded from imparting that information to the jury in their opening statement or on cross-examination, their only recourse was to do so in a jury instruction. Tsukamoto Shareholders maintain the circuit court should have accepted the following submitted jury instruction:

It has been established that [Former Directors], except [Klebahn], failed to act with informed judgment in connection with approving and recommending the ALPS merger agreement. This alone does not preclude [Former Directors] from proving that the ALPS transaction was entirely fair to shareholders.

Tsukamoto Shareholders argue that "[n]ot informing the jury of the crucial facts established against the [Former Directors] was prejudicially insufficient, erroneous, inconsistent, and misleading."

Given our holding that the circuit court erred in granting the Business Judgment Rule Motion, see Part III.A, we need not address this point.

### 3. JMOL Motions Re Punitives, Fraud/Conspiracy

On November 13, 2006, Cross–Appellants filed in open court the JMOL Motion Re Punitives and JMOL Motion Re Fraud/Conspiracy, and the circuit court orally granted the JMOL Motion Re Punitives.

On November 15, 2006, Sheehan orally moved for reconsideration of the court's oral grant of the JMOL Motion Re Punitives.

On November 21, 2006, the circuit court filed an order granting the JMOL Motion Re Fraud/Conspiracy, in which the court found "that [Sheehan] has produced no evidence of his assignor's reliance on the alleged misrepresentations and/or omissions, and no evidence of substantial pecuniary damages. Therefore, there is no legally sufficient evidentiary basis for a reasonable jury to find in [Sheehan's] favor on Counts V and VI of the Second Amended Complaint, which allege fraud and conspiracy to defraud."

On that same date, the circuit court filed an order granting the JMOL Motion Re Punitives, in which the court found "that there is no legally sufficient evidentiary basis for a reasonable jury to find that any [Former Director's] conduct met the standard required under controlling law to warrant an award of punitive damages as claimed in Count VIII of the Second Amended Complaint."

On November 28, 2006, the circuit court filed an order denying Sheehan's motion for reconsideration of the oral ruling granting the JMOL Motion Re Punitives.

Tsukamoto Shareholders maintain the circuit court erred in granting Former Directors' JMOL Motion Re Punitives and JMOL Motion Re Fraud/Conspiracy because the court failed to apply the proper standard in granting the motions. However, Tsukamoto Shareholders then proceed to argue not that the circuit court applied the wrong standard, but that in applying the correct standard, the court should have arrived at a different result: "[T]he [circuit] court failed to consider the evidence and the inferences which may be fairly drawn therefrom in the light most favorable to [Sheehan]. It could not be said that there was no evidence to support a jury verdict in [Sheehan's] favor."

### a. Fraud

■ Tsukamoto Shareholders argue that the circuit court erred in granting the motion for JMOL on the fraud count on the basis that Sheehan failed to establish he had relied on Former Directors' representations. Tsukamoto Shareholders contend that although Sheehan did not establish that he relied on Former Directors' fraudulent statements, the Grove Farm shareholders—of which Sheehan was a member—did so rely and "individual reliance is irrelevant in a group dynamic where the majority of a group is defrauded."

In support of this argument, Tsukamoto Shareholders cite to *Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105, 1124 (D.R.I.1990), in which the United States District Court for the District of Rhode Island held that

when a misrepresentation is made to a limited group of persons, an individual member of the group may be said to have relied on it if the misrepresentation induced the group to take action that was binding upon him even though he previously dissented. *See Restatement (Second) of Torts* § 552(2)(a) (1977). *See also* W. Keeton, D. Dobbs, R. Keeton, and D. Owen, *Prosser and Keeton on the Law of Torts* § 107 at 747, Supp. at 105 (5th ed. 1984 & Supp.1988).... To hold otherwise would deny redress to a group member harmed by a misrepresentation even though the member was unable to avoid the harm. It would also create the further anomaly of allowing recovery to those other members of the group whose majority action was the vehicle for that harm merely because they were actually deceived. Such a distinction is untenable. In each case, the harm is identical and flows just as directly from the misrepresentation. Therefore, the party making the misrepresentation should be equally accountable in both cases.

In this jurisdiction, the elements of fraud are: 1) false representations made by the defendant, 2) with knowledge of their falsity (or without knowledge of their truth or falsity), 3) in contemplation of plaintiff's reliance upon them, and 4) plaintiff's detrimental reliance. *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989). This jurisdiction has not adopted the holding set forth in *Dowling* that a group's reliance can take the place of the reliance of an individual member of that group for the purpose of establishing fraud. Rather, in Hawai'i, "[f]raud is never presumed," *Shoppe v. Gucci Am., Inc.,* 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000) (quoting *TSA Int'l, Ltd. v. Shimizu Corp.,* 92 Hawai'i 243, 255, 990 P.2d 713, 725 (1999)), and Sheehan's assignor's actual reliance on the alleged misrepresentations and resulting damages were elements of the claim Sheehan was required to prove by clear and convincing evidence. *Hawaii's Thousand Friends,* 70 Haw. at 286, 768 P.2d at 1301 (reversing jury verdict for plaintiff and remanding for dismissal of complaint where "there [was] no evidence indicating that [plaintiff] relied on defendants' representations, nor any evidence to show that [plaintiff] suffered any pecuniary damages as a result of defendants' misrepresentations"). *See also Giuliani v. Chuck,* 1 Haw.App. 379, 386, 620 P.2d 733, 738 (1980) (stating that a party asserting fraud "must have relied on the claimed misrepresentation"). Because Sheehan undisputably failed to adduce any evidence with respect to his reliance on the alleged fraud, there was no legally sufficient evidentiary basis for a reasonable jury to find in his favor on his fraud count. Therefore, the circuit court did not err in granting the JMOL Motion Re Fraud/Conspiracy.

### b. Conspiracy and Punitive Damages

Tsukamoto Shareholders maintain the circuit court erred in granting the JMOL motions on the conspiracy and punitive damages claims when the court "permitted the issues of whether [Former Directors] were loyal and acted in the best interests of shareholder [sic] to go to the jury" and the court, in the Amended Order, had "already determined that [Former Directors] failed to exercise due care and act with informed judgment." Those actions of the circuit court, Tsukamoto Shareholders contend, suggest that there were "disputed issues of material fact on both the conspiracy and punitive damages claims" sufficient to defeat the JMOL motions.

We fail to see how the circuit court's allowing Count III (Failure to Exercise Informed Judgment) of the Second Amended Complaint to go to the jury would necessarily indicate that there were material issues of fact with regard to Plaintiffs' conspiracy to defraud and punitive damages claims. Further, as we have already discussed, the circuit court erred by granting the Business Judgment Rule Motion in the 7/26/06 Order and Amended Order. See Part III.A. We conclude that the circuit court did not err in granting the JMOL motions on the conspiracy and punitive damages claims.

### 4. Dismissal of Tsukamoto's Claims

On September 1, 2006, Former Directors filed a "Motion to Dismiss [Tsukamoto's] Claims in the Second Amended Complaint for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment on [Tsukamoto's] Claims in the Second Amended Complaint" (Motion to Dismiss Tsukamoto's Claims). Former Directors argued:

1. Subject matter jurisdiction is not proper in this Court since Tsukamoto cannot show that his actual damages, if any, exceed the $5,000 jurisdictional minimum; to do so, Tsukamoto, who held only 10 of the 171,122 then-outstanding shares of Grove Farm, would have to demonstrate that his actual damages were equal to or more than $500 per share, which he cannot do; and

2. Tsukamoto's inclusion of a demand of punitive damages in Count VIII of the Second Amended Complaint ... does not cure the jurisdictional amount defect because it is legally and factually insufficient in that Tsukamoto has not alleged, and cannot show, any facts which demonstrate that [Former Directors] acted wantonly, oppressively,

or with such malice as to imply a conscious indifference to the consequences of their conduct, as has been previously decided by a trial court in this jurisdiction and affirmed by the Intermediate Court of Appeals based on the very same facts as before this Court.

Tsukamoto Shareholders filed an opposition memorandum to the motion, and Former Directors filed a reply memorandum.

In an October 3, 2006 order, the circuit court granted the Motion to Dismiss Tsukamoto's Claims pursuant to HRCP Rule 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

Tsukamoto Shareholders argue that the circuit court erred in dismissing Tsukamoto's claims on the eve of trial. They allege that the circuit court not only "improperly fail[ed] to consider that aggregation of [Tsukamoto's] shares with [Sheehan's] shares clearly exceeded the jurisdictional minimum, but it failed to take into consideration the issues of rescissory damages." They argue that Former Directors should have been estopped from moving to dismiss Tsukamoto's claims after the circuit court had already granted the Business Judgment Rule Motion in his favor.

### a. Aggregation

■ Tsukamoto Shareholders contend the circuit court should have aggregated Tsukamoto's and Sheehan's respective shares to determine subject matter jurisdiction with regard to Tsukamoto's claims. They argue that Tsukamoto and Sheehan "were attempting to enforce identical claims against [Former Directors]. Their interests were indistinguishable...." It is undisputed that Tsukamoto held 10 shares of Grove Farm stock, which were not valued at $500 or more than $500 each. It is also undisputed that Sheehan held 7,544 shares of Grove Farm stock. *Sheehan,* 114 Hawai'i at 385, 163 P.3d at 188. Tsukamoto Shareholders contend "[t]here is no doubt that with more than 7500 shares, [Sheehan] had met the jurisdictional burden of this Court. Therefore, ... Tsukamoto had also done so."

■ "[M]eeting the threshold requirement is an essential condition and element of [a plaintiff's] cause of action." *Parker v. Nakaoka,* 68 Haw. 557, 561, 722 P.2d 1028, 1031 (1986). HRS § 604-5(b) (Supp.2007) provides in part that "[i]f the demand is made in the complaint and the matter is triable of right by a jury, the action may be commenced in the circuit court if the amount in controversy exceeds $5,000."

Hawai'i courts have not squarely addressed whether minority shareholders alleging claims sounding in breach of fiduciary duty and fraud in a non-derivative action against the directors of a close corporation in which they hold shares, against the directors of the corporation, and against an attorney representing the buyer of the shares in the corporation can aggregate their interests to meet the jurisdictional minimum. "The Hawai'i Supreme Court has stated that 'in instances where Hawai'i case law and statutes are silent, this court can look to parallel federal law for guidance.' *Price v. Obayashi Hawaii Corp.,* 81 Hawai'i 171, 181, 914 P.2d 1364, 1374 (1996)." *Sheehan,* 114 Hawai'i at 389, 163 P.3d at 192.

■ The general rule is that "where a suit is brought against several defendants[,] asserting claims against each of them which are separate and distinct, the test of jurisdiction is the amount of each claim, and not their aggregate." *Lathem v. State Farm Mut. Auto. Ins. Co.,* 339 F.Supp.2d 767, 771–72 (S.D.Miss.2004) (internal quotation marks and citation omitted). The Supreme Court of the United States has held that "[a]ggregation has been permitted ... in cases in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." *Snyder v. Harris,* 394 U.S. 332, 335, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969).

■ "An identifying characteristic of a common and undivided interest [that may be aggregated for jurisdictional purposes] is that if one plaintiff cannot or does not collect his share, the shares of the remaining plaintiffs are increased." *Bowers v. Jefferson Pilot Fin. Ins. Co.,* 166 F.Supp.2d 552, 557

(E.D.Mich.2001) (internal quotation marks and citation omitted).

In *National Union Fire Ins. Co. of Pittsburg, PA v. ESI Ergonomic Solutions, LLC,* 342 F.Supp.2d 853, 859–60 (D.Ariz.2004), the United States District Court stated the following with regard to aggregation of claims:

> The exception to the non-aggregation rule applies only "where a defendant owes an obligation to a group of plaintiffs as a group and not to the individuals severally." *Gibson v. Chrysler Corp.,* 261 F.3d 927, 944 (9th Cir.2001). It typically arises in cases where there is a "single indivisible res" jointly owned by the plaintiffs that "creates an undivided obligation to them." *Id.* at 945. In *Eagle v. American Tel. & Tel. Co.,* 769 F.2d 541, 547 ([1985]), for instance, the Ninth Circuit allowed aggregation of a corporation's shareholders' claims for breach of fiduciary duty because the shareholders could not recover in their individual capacities under the governing law, but instead had to file a derivative suit on behalf of the corporation as a whole. The shareholders' common and undivided interest was their interest in the corporation's assets and their right to share its dividends. *Id.* at 546.

> By contrast, where the claims of the class members are "cognizable, calculable, and correctable individually," the class members ... may not aggregate claims to meet the amount in controversy. *Id.* at 945. *Potrero Hill Community Action Committee v. Housing Authority,* 410 F.2d 974, 978 (9th Cir.1969) is illustrative. In that case, a group of tenants sought a declaration that the San Francisco Housing Authority was under a duty to maintain their premises in a decent, safe, and sanitary condition and that they had no obligation to pay rent in the meantime. *Id.* at 975. No individual claim reached the $10,000.00 jurisdictional minimum in effect at the time. *Id.* at 978. The Ninth Circuit held that the tenants' claims could not be aggregated because they derived from the tenants' individual leases, not from rights that they held as a tenants' group. *Id.*

In the instant case, Plaintiffs alleged five counts in the Second Amended Complaint against Former Directors: breach of fiduciary duty (Count I), failure to act in good faith for the benefit of Grove Farm and its shareholders (Count II), failure to exercise informed judgment (Count III), negligence/gross negligence (Count IV), and fraud/misrepresentation (Count V); one count against Daniel Case and Former Directors: conspiracy to defraud (Count VI); one count against Daniel Case alone: breach of fiduciary duty (Count VII); and one count against Grove Farm Company, Former Directors, and Daniel Case: punitive damages (Count VIII). Plaintiffs' suit was not derivative; rather, Plaintiffs alleged that they had been injured directly.

In the Second Amended Complaint, Plaintiffs demanded judgment against Grove Farm Company, Former Directors, and Daniel Case, jointly and severally, for compensatory damages, "together with prejudgment interest at the maximum rate allowable by law," and punitive damages, in amounts to be determined at trial. The compensatory damages were for amounts Plaintiffs allegedly lost when their shares in Grove Farm were sold at less than full value.

In *Murphy v. Allied Tube & Conduit Corp.,* 61 F.Supp.2d 779 (N.D.Ill.1999), Edward Murphy (Murphy) and Richard Lambert (Lambert), individually and as former shareholders of Michael Industries, Inc. (Michael), brought a four-count complaint against Allied Tube & Conduit Corporation (Allied). *Id.* at 779. Murphy and Lambert invoked federal jurisdiction on diversity-of-citizenship grounds pursuant to 28 U.S.C. § 1332(a). *Murphy,* 61 F.Supp.2d at 779. That statute provided in relevant part that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs...."

Each of the four counts, which sought identical relief under a different theory, complained that Allied took possession of and kept $82,233.29 that should have gone to Michael's former shareholders. *Id.* at 780. The United States District Court held that Murphy and Lambert failed to make the

essential showing of subject-matter jurisdiction because "*neither* Murphy nor Lambert ... asserted an over-$75,000 claim against Allied. And the case law unambiguously requires that in a federal diversity action *each* plaintiff's claim must exceed the jurisdictional amount in controversy without aggregation." *Id.* at 780–81. The district court opined:

> Suppose ... that Murphy and Lambert were to urge instead that the amount assertedly owed by Allied is somehow an indivisible claim that runs to all of Michael's former shareholders as a group—a concept that [*Snyder v. Harris*, 394 U.S. 332, 335, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969),] refers to as a "case in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." Although that would really be an impermissible contention in this case, where *each* of the owners of the corporate stock has individually agreed to sell his or her *own* stock, Murphy and Lambert would nevertheless be impaled on the other horn of a dilemma. Even under that fanciful hypothesis, the claim against Allied would by definition belong to *all* of Michael's former shareholders as a group (not to Murphy and Lambert alone), and the present Complaint would then be fatally defective in its having failed to join and identify *all* of the former shareholders and to demonstrate *their* total diversity of citizenship from Allied.

*Id.* at 781 (brackets in original omitted).

The instant case is like *Murphy* because all Grove Farm shareholders, with the exception of Sheehan, sold their own stock. *Sheehan*, 114 Hawai'i at 382, 163 P.3d at 185. Further, in the Second Amended Complaint, Tsukamoto Shareholders did not argue that their claim that Grove Farm Company, Former Directors, and Daniel Case were liable for damages was an indivisible claim running to all of Grove Farm's former shareholders as a group. *See Murphy*, 61 F.Supp.2d at 781.

There is no evidence that if Sheehan had not collected his pro rata share of damages, Tsukamoto's pro rata share would have been increased, or vice-versa. *See Bowers*, 166 F.Supp.2d at 557. There was no "single indivisible res jointly owned by the plaintiffs that [created] an undivided obligation to them." *Nat'l Union*, 342 F.Supp.2d at 859 (internal quotation marks and citation omitted).

In support of their aggregation argument, Tsukamoto Shareholders cite to *Kelly v. Hartford Accident & Indemnity Co.*, 294 F.2d 400 (5th Cir.1961), in which Mrs. Adams was killed in an accident while traveling as a passenger in a car driven by her husband, Mr. Adams, who survived. 294 F.2d at 401. Mrs. Adams had no descendants or ascendants. *Id.* Mrs. Adams's brothers and sisters (Sibling(s)) brought a wrongful death action directly against Mr. Adams's insurer. *Id.* The insurer moved to dismiss on the ground that under Louisiana law, the Siblings did not have standing to bring the action. *Id.* The United States District Court for the Eastern District of Louisiana granted the insurer's motion to dismiss on that basis. *Id.* at 402.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed, holding that the Siblings did not have standing because Mrs. Adams had left a surviving husband: "[The Siblings] neither succeeded to [Mrs. Adams's] claim for her own injury, nor were granted any independent right of action for grief, loss of affection, or other damages suffered by reason of the death of their sister." *Id.* at 403.

Of significance to the instant appeal is that in *Kelly*, the Siblings filed a petition for a rehearing, in which they argued for the first time that "the action was not removable under 28 [U.S.C.] § 1441 and § 1332, because the matter in controversy did not exceed the sum or value of $10,000, exclusive of interest and costs." *Kelly*, 294 F.2d at 409. The Siblings had claimed they were entitled to $10,000 each, for a total of $50,000. *Id.* The Fifth Circuit stated that "[t]he settled rule is that when two or more plaintiffs having separate and distinct demands unite in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a single title or right in which they have a

common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount." *Kelly*, 294 F.2d at 409 (quoting *Pinel v. Pinel*, 240 U.S. 594, 596, 36 S.Ct. 416, 417, 60 L.Ed. 817 (1916)). The Fifth Circuit denied the petition for rehearing, holding that the case came within the "latter class since the five plaintiffs seek to enforce a single right of action for the wrongful death of their sister." *Kelly*, 294 F.2d at 409.

*Kelly* is inapposite to this case because the Siblings in *Kelly* alleged identical claims against the same defendant and each Sibling claimed an identical amount in damages. Here, Plaintiffs alleged a variety of claims against a variety of defendants, and Tsukamoto and Sheehan had a different number of shares in Grove Farm that would have entitled them to different sums of money if they had prevailed below. Further, as we have discussed, Plaintiffs' allegation of wrongdoing was not made on behalf of all of Grove Farm's shareholders, only some of them.

Given the foregoing, the circuit court did not err by ruling that Tsukamoto and Sheehan could not aggregate their claims to meet the jurisdictional minimum.

### b. Rescissory Damages

The term "rescissory damages" has been defined as "the value of the property taken as of the time when it was transferred, or conveyed to the defendant." *Borghetti v. Sys. & Computer Tech, Inc.*, 199 P.3d 907, 914 (Utah 2008) (ellipsis and footnote omitted).

Rescissory damages is [sic] an exception to the normal out-of-pocket measure. They are exceptional, because such damages are measured as of a point in time *after* the transaction, whereas compensatory damages are determined at the time *of* the transaction. As a consequence, rescissory damages may be significantly higher than the conventional out-of-pocket damages, because rescissory damages could include post-transaction incremental value elements that would not be captured in an "out-of-pocket" recovery.

*Strassburger v. Earley*, 752 A.2d 557, 579 (Del.Ch.2000). Tsukamoto Shareholders argue that the circuit court, when determining whether Tsukamoto's claims met the jurisdictional minimum, should have considered the fact that Tsukamoto Shareholders may have been entitled to rescissory damages at trial.

Tsukamoto Shareholders provide no authority for this contention, and we find none in this jurisdiction. Further, there is no evidence in the record on appeal that the circuit court did not consider potential rescissory damages when granting the Motion to Dismiss Tsukamoto's Claims. Last, prior to filing their opposition memorandum to the Motion to Dismiss Tsukamoto's Claims, Tsukamoto Shareholders did not demonstrate that they were entitled to rescissory damages and, if so, in what amount. In their Second Amended Complaint, they did not demand rescissory damages and in their opposition memorandum, they only claimed that they "may be entitled to rescissory damages at trial." "[T]he party seeking a court's jurisdiction carries the burden throughout litigation of showing proper jurisdiction and, if jurisdiction is challenged, the party must support its allegation of jurisdiction by competent proof." *Sheehan*, 114 Hawaiʻi at 390, 163 P.3d at 193. Tsukamoto Shareholders did not provide competent proof for their claim that the circuit court should take into account Tsukamoto Shareholders' prospective rescissory damages when determining whether Tsukamoto's claims met the jurisdictional minimum.

### c. Estoppel

Tsukamoto Shareholders contend the circuit court should have been estopped from dismissing Tsukamoto because Former Directors moved to dismiss Tsukamoto's claims after Tsukamoto had already obtained partial summary judgment in his favor on Count III. Tsukamoto Shareholders argue that "[i]t seems more than a bit unfair for [Former Directors] to sit on their argument (that [Tsukamoto] had too few shares to meet the jurisdictional minimum), and only move after partial summary judgment was granted against them."

Again, Tsukamoto Shareholders provide no authority for this point, and we find none in

this jurisdiction. Further, besides stating that it was "unfair," they fail to explain how the circuit court's alleged error prejudiced them. "Questions regarding subject matter jurisdiction may be raised at any stage of a cause of action." *Lingle,* 107 Hawai'i at 182, 111 P.3d at 591.

### d. Result

The circuit court did not err by granting the Motion to Dismiss Tsukamoto's Claims.

### 5. Motion to Amend Answer

 Tsukamoto Shareholders contend the circuit court erred by granting Former Directors' Motion to Amend Answer because Former Directors delayed filing the motion for five years, had five prior opportunities to assert the two new affirmative defenses set forth in the motion, and filed the motion five weeks before trial began.

Plaintiffs filed their initial Complaint on November 29, 2002, and their First Amended Complaint on January 14, 2003. On April 3, 2003, Plaintiffs filed their Second Amended Complaint, and on April 22, 2003, Grove Farm Company and Former Directors filed an answer to the Second Amended Complaint.

On September 20, 2006, Former Directors filed the Motion to Amend Answer, in which they stated they were filing the motion

> for the purpose of pleading as affirmative defenses (1) the provisions of HRS § 414–262(a) [6] and (2) the exculpatory provision contained in Article Eleventh [sic] of the Articles of Association of [Grove Farm].[7] Since no prejudice will result from the pleading of these affirmative defenses, leave should be "freely given" as required by Rule 15(a), HRCP.

As permitted by Hawai'i law, [Former Directors] have raised both the contractual protections of Article Eleventh [sic] and the statutory provisions of HRS § 414–262(a) by motion for summary judgment. Nevertheless, and although [Former Directors] are aware of no authority for the proposition that these defenses may be waived if not pleaded as affirmative defenses in the Answer, [Former Directors] bring this motion out of an abundance of caution to remove any uncertainty. Leave to amend should be "freely given" because justice requires that [Former Directors] be permitted to assert applicable defenses, there is no bad faith or dilatory motive, and Plaintiffs will not be prejudiced in any way since the matters [Former Directors] propose to plead as affirmative defenses raise purely issues of law that require no additional discovery and will cause no delay in the proceedings.

Former Directors maintained that they had been unaware Plaintiffs would have a claim for breach of the duty of loyalty until July 24, 2006, when Plaintiffs filed their Rescissory Damages Discovery Motion and claimed breach of that duty for the first time. In their Second Amended Complaint, Plaintiffs claimed breach of fiduciary duties, but not breach of the duty of loyalty. Former Directors contended there was a material difference between the two claims. Former Directors maintained that Plaintiffs would not be prejudiced by the addition of the affirmative defense to Former Directors' answer because, knowing they were asserting a breach-of-duty-of-loyalty claim, Plaintiffs had had full opportunity to conduct discovery on that claim.

---

6. HRS 414–262(a) (2004 Repl.) provides:

 **§ 414–262 Judicial action.** (a) A transaction effected or proposed to be effected by a corporation (or by a subsidiary of the corporation or any other entity in which the corporation has a controlling interest) that is not a director's conflicting interest transaction may not be enjoined, set aside, or give rise to an award of damages or other sanctions, in a proceeding by a shareholder or by or in the right of the corporation, because a director of the corporation, or any person with whom or

which the director has a personal, economic, or other association, has an interest in the transaction.

7. Former Directors alleged that "Article Eleventh" [sic] of Grove Farm's Articles of Association eliminated their liability for "monetary damages to the greatest extent permitted by Hawai'i law, and by HRS § 415–48.5 (1989), which was enacted to permit Hawai'i corporations to eliminate director liability for monetary damages for breaches of the duty of care."

Former Directors asserted no reason for their delay in asserting their "Article Eleventh" defense, aside from "inadvertence of counsel." Nevertheless, they argued, there was no "bad faith or dilatory motive" in the delay and Plaintiffs would not be prejudiced by it because the issue raised by the defense was a question of law requiring no additional discovery.

On September 22, 2006, Tsukamoto Shareholders filed an opposition to the Motion to Amend Answer. They asserted that pursuant to *Marks v. Marks,* 51 Haw. 548, 465 P.2d 996 (1970), the delay alone was sufficient to warrant a denial of the motion. Tsukamoto Shareholders argued that Former Directors failed to show that Former Directors' delay in asserting the new defenses was due to oversight, inadvertence, or excusable neglect. Tsukamoto Shareholders contended that Former Directors should have known Tsukamoto Shareholders were asserting breach of duty of loyalty because the Second Amended Complaint included a claim for breach of fiduciary duties, one of the "triads" of the business judgment rule is the duty of loyalty, and Former Directors knew the business judgment rule was at issue in this case prior to filing their Motion to Amend Answer.

Tsukamoto Shareholders maintained that "[b]ecause [Former Directors] unduly delayed in asserting these new defenses, [Tsukamoto Shareholders] incurred hundreds of thousands of dollars of attorney's fees and costs." (Footnote omitted.) Tsukamoto Shareholders argued that Former Directors had waited to move to amend their answer "in hopes [sic] that [Tsukamoto Shareholders] would exhaust their financial reserves."

In its October 3, 2006 Order, the circuit court granted the motion.

On October 9, 2006, Former Directors filed their First Amended Answer to the Second Amended Complaint.

HRCP Rule 15(a) provides that [a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

"A request for leave to amend may be made at any time and is addressed to the sound discretion of the court. Leave should be freely granted in the absence of bad faith or dilatory actions, or undue prejudice to the opposing party." *Kahalepauole v. Assocs. Four,* 8 Haw.App. 7, 14, 791 P.2d 720, 724 (1990) (citations omitted).

In *Marks,* 51 Haw. at 560–62, 465 P.2d at 1003–04, the Hawai'i Supreme Court held that the circuit court had not erred in denying the defendants' motion to amend their answer to assert a permissive counterclaim where: defendants requested to amend their answer four-and-a-half years after the original answer had been filed, eight months after oral argument on both parties' summary judgment motions had been heard, and two months after the circuit court judge had announced his decision to grant plaintiffs' motion for summary judgment.

The supreme court further held that the circuit court had not erred by denying the defendants' motion to amend the answer to assert a compulsory counterclaim where: defendants had delayed the motion four-and-a-half years and had not alleged oversight, inadvertence, or excusable neglect and the court had announced its ruling before defendants sought the amendment. *Id.* at 562 & 564, 465 P.2d at 1004.

*Marks* is inapplicable to the instant case because Former Directors did not move to amend their answer after the circuit court decided all issues in the case. *See Marks,* 51 Haw. at 560–61, 465 P.2d at 1003. Further, in their Motion to Amend Answer, Former Directors did allege "inadvertence" on the part of their attorney with regard to their failure to plead the "Article Eleventh" defense.

Tsukamoto Shareholders argued that Former Directors' delay in filing the Motion to

Amend Answer caused [Tsukamoto Shareholders] to incur "hundreds of thousands of dollars of attorney's fees and costs," but did not elaborate or otherwise explain how they had been prejudiced. Consequently, we conclude that Tsukamoto Shareholders did not meet their burden to show that undue prejudice resulted from the delay. Given the foregoing, the circuit court did not abuse its discretion in granting the Motion to Amend Answer.

### 6. Dismissal of Grove Farm Company

Tsukamoto Shareholders contend the circuit court erred in dismissing Grove Farm Company as a defendant. Tsukamoto Shareholders argue that Grove Farm Company failed to meet its burden of establishing as a matter of law that Plaintiffs could not have prevailed against it under any alternative theory.

On June 4, 2004, Grove Farm Company filed a Motion for Judgment on the Pleadings. Grove Farm Company argued it was entitled to judgment on the pleadings because the Second Amended Complaint, on its face, failed to state any claim against Grove Farm Company.

On June 15, 2004, Plaintiffs filed an opposition to the motion based on the agency theory. Plaintiffs argued that although directors are not usually agents of the corporation, in this case Former Directors were agents of Grove Farm Company because they had accepted "responsibilities to act on its behalf." As principal, Plaintiffs continued, Grove Farm Company was liable for Former Directors' torts and was, therefore, a "necessary and proper defendant in this action."

On July 29, 2004, the circuit court filed an order granting the motion for judgment on the pleadings.

On June 8, 2006, Tsukamoto Shareholders filed a motion for reconsideration of the order (Motion for Reconsideration). They sought reconsideration based on an October 28, 2002 letter sent by Grove Farm Company's counsel "to a majority of former shareholders." Tsukamoto Shareholders claimed they had not obtained the letter until after the circuit court granted the Motion for Judgment on the Pleadings and argued that the letter sought to

dissuade shareholders from joining with [Sheehan] in his lawsuit against [Grove Farm Company] and former directors. Indeed, the last sentence stated as follows: "There is just no basis now for [Sheehan] to take matters out of context to fashion his arguments and we urge all shareholders not to be swayed by them."

By directing its counsel to send a materially inaccurate and misleading letter to shareholders dissuading them from exercising their rights and inquiring further into this matter, Grove Farm [Company] thrust itself into this case. It aided and abetted the fraud and misrepresentation perpetrated on shareholders by [Former Directors].

(Footnote omitted.)

On June 23, 2006, Grove Farm Company and Former Directors filed an opposition to the Motion for Reconsideration, in which they argued that the motion was untimely pursuant to HRCP Rule 59(e) because Tsukamoto Shareholders had not filed the motion within 10 days after the circuit court had filed its order granting the Motion for Judgment on the Pleadings. Further, Grove Farm Company and Former Directors contended that the October 28, 2002 letter was irrelevant to the Motion for Judgment on the Pleadings because the letter was allegedly evidence of Grove Farm Company's post-merger conspiracy to defraud and Plaintiffs had alleged only a pre-merger conspiracy to defraud between Klebahn and Daniel Case in the Second Amended Complaint.

On July 25, 2006, the circuit court filed an order denying the Motion for Reconsideration.

In *Taniguchi v. Ass'n of Apartment Owners of King Manor, Inc.*, 114 Hawai'i 37, 50, 155 P.3d 1138, 1151 (2007), the Hawai'i Supreme Court held:

"It is a well established rule both in Hawai'i and in a majority of the States that the relation of directors to the corporations they represent is a fiduciary one." *Hawaiian Int'l Fins. v. Pablo*, 53 Haw. 149, 153, 488 P.2d 1172, 1175 (1971) (cita-

tions omitted). Further, "[a] corporate officer is an agent for his corporate principal." *Williams v. Queen Fisheries,* 2 Wash.App. 691, 469 P.2d 583, 585 (1970).

The United States Supreme Court has stated that "a corporation is liable *civiliter* for torts committed by its servants or agents precisely as a natural person; and . . . it is liable as a natural person for the acts of its agents done by its authority, express or implied. . . ." *Denver & R G R Co. v. Harris,* 122 U.S. 597, 608, 7 S.Ct. 1286, 1289, 30 L.Ed. 1146 (1887) (internal quotation marks and citation omitted).

 Of the counts against Former Directors in the Second Amended Complaint, only fraud/misrepresentation (Count V) and conspiracy to defraud (Count VI) sound in tort. *Hong v. Kong,* 5 Haw.App. 174, 181, 683 P.2d 833, 840 (1984) ("Fraud is a common-law tort."). In their answering brief, Grove Farm Company and Former Directors argue that the circuit court properly dismissed Grove Farm Company as a defendant because Plaintiffs did not allege injury based on a principal-agent theory. We disagree. HRCP Rule 9(b) provides in relevant part that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." As the Hawai'i Supreme Court stated in *Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 30, 837 P.2d 1273, 1288 (1992), "[t]he rule is designed, in part, to insure [sic] the particularized information necessary for a defendant to prepare an effective defense to a claim which embraces a wide variety of potential conduct." In the Second Amended Complaint, Plaintiffs named Grove Farm Company as a defendant and clearly argued that Former Directors were acting in their capacity as officers of Grove Farm when they allegedly committed fraud and conspiracy to defraud. That description of the circumstances was sufficient to put Grove Farm Company, Former Directors, and Daniel Case on notice that Plaintiffs were alleging a principal-agent relationship between Grove Farm and Former Directors.

 Given the foregoing, with regard to Counts V and VI of the Second Amended Complaint, the circuit court erred by granting Grove Farm Company's Motion for Judgment on the Pleadings. Nevertheless, the error was harmless, given that the circuit court entered judgment in favor of Former Directors on those counts.

### 7. Dismissal of Daniel Case as a Defendant

Tsukamoto Shareholders and Shareholders argue that the circuit court erred in dismissing Daniel Case as a defendant because there were numerous disputed issues of material fact regarding whether Daniel Case breached his fiduciary duties to stockholders when he represented his son, Stephen Case, in the sale of Grove Farm while Grove Farm was being represented by CB & L in the transaction. Tsukamoto Shareholders also maintain that there were genuine issues of material fact regarding whether Daniel Case conspired with Former Directors to defraud stockholders into selling their shares to Stephen Case for less than their true value and whether Former Directors could have waived the conflict of interest that arose in the transaction when Daniel Case represented Stephen Case, the buyer, and Daniel Case's law firm, CB & L, represented Former Directors, the sellers.

In the Second Amended Complaint, Plaintiffs alleged the following counts against Daniel Case: conspiracy to defraud (Count VI), breach of fiduciary duty (Count VII), and punitive damages (Count VIII). Count VI provides in relevant part:

### COUNT VI—CONSPIRACY TO DEFRAUD

. . . .

85. [Klebahn], with the tacit approval of the other Individual Defendants, conspired with [Daniel] Case to defraud the shareholders into believing that $152 was the highest price which could be attained in order to ensure that ALPS would be the purchaser of [Grove Farm] and [CB & L] would continue to represent [Grove Farm].

86. [Daniel] Case knew that the only way to ensure that his law firm continued to represent [Grove Farm] was for ALPS to be the successful purchaser. Likewise,

[Daniel] Case also knew that the only way to ensure that ALPS was the successful purchaser was for [CB & L] to represent [Grove Farm] during the negotiations.

87. On or about September 22, 2000, [Daniel] Case and [Klebahn] agreed that [CB & L] would continue to represent [Grove Farm] in connection with the Board's attempt to sell all or substantially all of [Grove Farm's] shares.

88. Over the course of the following few weeks, they developed a plan to defraud the shareholders and ensure that ALPS was the successful purchaser.

89. First, they agreed that [CB & L] would continue to represent [Grove Farm] even though [Daniel] Case was acting as [Stephen Case's] agent in the transaction. This would ensure that [Daniel] Case remained privy to confidential information concerning ALPS' competitors.

90. Second, no restrictions were placed upon [Daniel] Case's ability to contact and discuss the transaction and any background information with his partners who were directly involved with [Grove Farm] and its efforts to find a merger partner. [Daniel] Case had access to confidential information in the possession of [CB & L] concerning [Grove Farm]. No other representatives or principals of other potential purchasers for [Grove Farm] were given similar access to this information.

91. Third, [Klebahn] agreed to provide [Daniel] Case with confidential and proprietary information concerning competing offers, the internal voting of the Board, and their "strike price." This information was not provided to other interested parties or their principals or agents.

92. Fourth, they agreed to inhibit and deter other interested parties from making competing and superior offers for the shares. In order to do so, [CB & L] was slow to produce materials and information to the other interested parties.

93. Fifth, they placed the ALPS' offer for fast-track Board approval. Although there were other serious parties whose interest in purchasing [Grove Farm] predated ALPS and who were supposedly then in active negotiation with [Grove Farm], [Grove Farm], through [Klebahn] with knowledge and participation of [CB & L] and the Individual Defendants, failed to provide the parties with an opportunity to meet or beat the ALPS offer prior to voting in favor of it at the October 17, 2000 board meeting.

94. Sixth, since they knew that the Wattson–Breevast offer of $170 per share under the same material terms and conditions as the ALPS Merger Agreement was a superior acquisition offer, they agreed that the Board would not further compromise [CB & L] by requesting a legal opinion on that issue.

95. Seventh, after additional questions continued to surface concerning the "Case" conflict of interest, they agreed that the Board would at the eleventh hour and at great expense to [Grove Farm] retain another law firm to "give cover" to that charge and to minimize the appearance of impropriety.

96. When these additional questions concerning the conflict of interest surfaced, [Daniel] Case and [CB & L] were obligated to either seek an advisory opinion concerning the conflict of [sic] the Office of Disciplinary Counsel or advise [Grove Farm] to obtain independent counsel solely to review the matter. They did neither.

97. As a result of their collective acts in furtherance of the conspiracy, ALPS became the successful purchaser of [Grove Farm] for less than the true value of what it was worth. [CB & L] continues to this day to represent [Grove Farm]. All of the Individual Defendants received the benefits of a 6 year, tail-end E & O insurance policy covering their actions in connection with the ALPS merger.

In Count VII, Plaintiffs alleged that Daniel Case, as a law partner at CB & L, breached his fiduciary duty to Grove Farm and its shareholders, including Plaintiffs, in acting as Stephen Case's agent. In Count VIII, Plaintiffs alleged that Daniel Case was liable for punitive damages.

On May 25, 2005, Daniel Case filed a Motion for Summary Judgment (Case's SJ Motion), in which he argued that he was entitled

to be dismissed by summary judgment because he had no duty to Plaintiffs, since neither he nor CB & L had ever been an attorney for Grove Farm shareholders. He added that there was no conflict of interest when he acted as Stephen Case's agent in Stephen Case's purchase of Grove Farm because (1) he had not done any work for Grove Farm for at least six years prior to becoming agent for Stephen Case, (2) Former Directors had waived any conflict of interest that arose when he acted as Stephen Case's agent, and (3) the business judgment rule prohibited Plaintiffs from alleging that Former Directors' decision to waive the conflict of interest was improper. He also argued that Plaintiffs could not show by the clear-and-convincing standard of proof that there was a genuine issue of material fact that he conspired to defraud Plaintiffs.

Plaintiffs filed an opposition memorandum on June 3, 2005, in which they argued that because Daniel Case was a partner and chairman of the board of CB & L at the time he represented Stephen Case in the purchase of Grove Farm, Daniel Case had a "dual representation" that "created an unwaivable conflict of interest," which he "fully exploited." Plaintiffs added that even if the conflict of interest had been waivable, Daniel Case improperly obtained the waiver and acted outside the scope of the waiver. Plaintiffs claimed that the business judgment rule did not apply because Daniel Case and a CB & L attorney representing Grove Farm in the sale, James Cribley (Cribley), had failed to properly advise Former Directors regarding the conflict of interest. Plaintiffs also maintained that Daniel Case and CB & L had fiduciary duties to Grove Farm shareholders because "the shareholders were third[-]party beneficiaries of the contract of representation between [CB & L] and [Grove Farm]. [Daniel Case] and [Cribley] owed all shareholders fiduciary duties including, but not limited to, utmost loyalty and care." Plaintiffs asserted that there were genuine issues of material fact regarding the conspiracy-to-defraud claim.

On January 30, 2006, the circuit court filed an order granting Case's SJ Motion on the ground that Plaintiffs lacked standing.

### a. Breach of Fiduciary Duty

"It is well-settled that courts must determine as a threshold matter whether they have jurisdiction to decide the issues presented. If a party is found to lack standing, the court is without subject matter jurisdiction to determine the action." *Hawaii Med. Ass'n*, 113 Hawai'i at 94, 148 P.3d at 1196 (citations omitted).

In *Hanabusa v. Lingle*, 119 Hawai'i 341, 347, 198 P.3d 604, 610 (2008), the Hawai'i Supreme Court stated the following with regard to standing:

"Standing is concerned with whether the parties have the right to bring suit." *Mottl v. Miyahira*, 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001) (quoting *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994)).

It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's remedial powers on his or her behalf. *In re Application of Matson Navigation Co. v. Federal Deposit Ins. Corp.*, 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996). In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury. *Bush v. Watson*, 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (1996).

With respect to the first prong of this test, the plaintiff "must show a distinct and palpable injury to himself [or herself.]" *Life of the Land v. Land Use Commission of State of Hawai'i*, 63 Haw. 166, 173 n. 6, 623 P.2d 431, 446 n. 6 (1981). The injury must be "distinct and palpable, as opposed to abstract, conjectural, or merely hypothetical." *Doyle v. Oklahoma Bar Ass'n*, 998 F.2d 1559, 1566 (10th Cir.1993) (citations omitted).

*Mottl,* 95 Hawai'i at 389, 23 P.3d at 724, quoting *Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court,* 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999). The requirement of a "distinct and palpable injury" requires a plaintiff to have suffered an "injury in fact." *Mottl,* 95 Hawai'i at 391, 23 P.3d at 726.

In this case, with regard to Count VII (breach of fiduciary duty), we hold that Daniel Case had no duty to Grove Farm shareholders, for it is clear from the record on appeal, and Tsukamoto Shareholders and Shareholders do not dispute, that (1) there was no contractual relationship between Daniel Case and Tsukamoto Shareholders or Shareholders and (2) Daniel Case represented Stephen Case and not Grove Farm or its shareholders in the transaction. Further, any conflict of interest that may have been presented by Daniel Case's representation of Stephen Case and CB & L's representation of Grove Farm in the transaction was expressly waived by the Grove Farm board of directors. Therefore, Tsukamoto Shareholders and Shareholders lacked standing to sue Daniel Case.

We also conclude that there is no merit to Tsukamoto Shareholders' allegations that Daniel Case owed a duty to them because he was a partner and chairman of the board of CB & L. The majority of courts nationally have held that a corporation's attorney generally has no duty to minority shareholders of the corporation. *See, e.g., Palmer v. Fox Software, Inc.,* 107 F.3d 415, 420–21 (6th Cir.1997) (holding that minority shareholder had no direct cause of action against corporate attorney for malpractice where insufficient evidence existed to demonstrate that personal reliance on the advice of attorney was reasonable); *Bobbitt v. Victorian House, Inc.,* 545 F.Supp. 1124, 1126 (N.D.Ill.1982) (representing a small, close corporation "does not inherently mean also acting as counsel to the individual directors-shareholders"); *McDermott, Will & Emery v. Superior Court,* 83 Cal.App.4th 378, 383–85, 99 Cal. Rptr.2d 622, 626–27 (2000) (holding that shareholders may not bring derivative malpractice suit against corporation's outside counsel); *Egan v. McNamara,* 467 A.2d 733,

735–37 & 739–40 (D.C.1983) (holding that attorney did not breach his fiduciary duty to closely held corporation and deceased majority shareholder, despite numerous prior representations made by attorney on behalf of deceased shareholder, because attorney represented the entity, not its individual shareholders, officers, and directors); *Brennan v. Ruffner,* 640 So.2d 143, 145–46 (Fla.Dist.Ct. App.1994) (holding that an attorney did not represent individual shareholders when he drafted the shareholders' agreement); *Felty v. Hartweg,* 169 Ill.App.3d 406, 119 Ill.Dec. 799, 523 N.E.2d 555, 557 (1988) (holding that corporation's attorney did not have fiduciary duty to a minority shareholder where there was no express agreement that the minority shareholder was to be a beneficiary of the contract between the attorney and corporation); *Goerlich v. Courtney Indus., Inc.,* 84 Md.App. 660, 581 A.2d 825, 827–28 (Spec.App.1990) (holding that an attorney who drafted a shareholders' agreement may not be liable to one of those shareholders for negligent representation); *Multilist Serv. of Cape Girardeau, Mo., Inc. v. Wilson,* 14 S.W.3d 110, 114 (Mo.Ct.App.2000) (holding that individual members of a corporation do not have an attorney-client relationship with the corporation's attorney); *Delta Automatic Sys., Inc. v. Bingham,* 126 N.M. 717, 974 P.2d 1174, 1177–78 (Ct.App.1998) (holding that shareholders of a closely held corporation were not entitled to maintain a legal malpractice claim against an attorney who represented the corporation); *Bowen v. Smith,* 838 P.2d 186, 194–96 (Wyo.1992) (holding that a law firm retained by a corporation to litigate a dispute may not be liable to a minority shareholder for favoring the interest of a majority shareholder in division of settlement proceeds).

In the instant case, we decline to depart from the generally accepted rule that an attorney for a closely held corporation owes no duty to individual shareholders. The Hawai'i Rules of Professional Conduct (HRPC) Rule 1.13 (Organization as Client) supports this view. HRPC Rule 1.13(a) clearly states that a "lawyer employed or retained by an organization *represents the organization* acting through its duly authorized constituents."

(Emphasis added.) HRPC Rule 1.13(b) provides in relevant part:

**(b)** If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act, or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest *of the organization.* In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization, and the apparent motivation of the person involved, the policies of the organization concerning such matters, and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization.

(Emphasis added.)

Further, HRPC Rule 1.13(e) provides that a "lawyer representing an organization *may* also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7." [8] (Emphasis added.) Rule 1.13(e) does not state that a lawyer representing an organization necessarily also represents the organization's shareholders.

A comment to HRPC Rule 1.13 provides:

**Clarifying the Lawyer's Role**

There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer should advise any constituent whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that *the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation.* Care must be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.

Whether such a warning should be given by the lawyer for the organization to any constituent individual may turn on the facts of each case.

(Emphasis added.) The comment thus emphasizes that the corporate lawyer does not represent the corporation's constituents, such as the corporation's shareholders. Although the comment states that a lawyer should inform a constituent of a conflict or potential conflict between the organization and the constituent, the comment does not mandate that a lawyer do so.

Nor were Tsukamoto Shareholders third-party beneficiaries of the attorney-client relationship between Grove Farm's attorneys and Grove Farm. In *Blair v. Ing,* 95 Hawai'i 247, 21 P.3d 452 (2001), the Hawai'i Supreme Court stated the following with regard to the third-party-beneficiary theory:

[A] third[-]party[-]beneficiary theory is commonly advanced to establish liability to a non-client who is not in strict privity with an attorney. *See generally,* 4 Legal Malpractice § 31.4. This approach focuses

---

8. HRPC Rule 1.7 provides in relevant part:
 **RULE 1.7. CONFLICT OF INTEREST: GENERAL RULE.**
 (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
 (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
 (2) each client consents after consultation.
 (b) A lawyer shall not represent a client if the representation of that client may be materi-

ally limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and
 (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

upon whether the primary purpose of the client-attorney relationship was to benefit the non-client. *Donahue [v. Shughart, Thomson & Kilroy, P.C.*, 900 S.W.2d 624, 628 (Mo.1995)]* (holding, *inter alia*, that, as an exception to the general rule that an attorney is only liable to his client for negligence, a non-client may maintain a legal malpractice action based upon a third[-]party[-]beneficiary claim) (citations omitted). "The essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain." *Copenhaver v. Rogers*, 238 Va. 361, [367,] 384 S.E.2d 593, 596 (1989). Thus, "the third[-]party[-]beneficiary approach focuses the existence of a duty entirely on whether the plaintiff was the person intended to be benefitted by the legal services and does not extend to those incidentally deriving an indirect benefit." *Donahue*, 900 S.W.2d at 628. In other words, the non-client must have been an intended beneficiary, not merely an incidental beneficiary.

*Id.* at 255, 21 P.3d at 460 (brackets in original omitted).

We are not persuaded that Tsukamoto Shareholders were third-party beneficiaries of the attorney-client relationship between Daniel Case and CB & L and Grove Farm. There is no evidence in the record on appeal that Grove Farm retained its attorneys for the purpose of conferring a benefit to Tsukamoto Shareholders.

### b. Conspiracy to Defraud

*Black's Law Dictionary* 685 (8th ed.2004) defines "fraud" as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." In *Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel*, 113 Hawai'i 251, 151 P.3d 732 (2007), the Hawai'i Supreme Court stated:

> A fraud claim against a lawyer is no different from a fraud claim against anyone else. If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability. *While an attorney's professional duty of care extends only to his own client and intended beneficiaries of his legal work, the limitations on liability for negligence do not apply to liability for fraud.*
>
> *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal.App.4th 282, 17 Cal.Rptr.3d 26, 31–3[2] (2004) (internal citations and quotations omitted).
>
> [*Clark v. Druckman*, 218 W.Va. 427, 624 S.E.2d 864, 870 (2005).]

*Id.* at 269, 151 P.3d at 750 (brackets in original and ellipsis omitted; emphasis added). According to the Hawai'i Supreme Court, "the accepted definition of a [civil] conspiracy is a combination of two or more persons or entities by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." *Robert's Hawai'i Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 91 Hawai'i 224, 252 n. 28, 982 P.2d 853, 881 n. 28 (1999) (internal quotation marks, citation, and brackets in original omitted).

 Given the foregoing, a fiduciary relationship is not a required element of conspiracy to defraud. Therefore, Tsukamoto Shareholders had standing to bring their conspiracy-to-defraud claim against Daniel Case and the circuit court was wrong to find that Tsukamoto Shareholders lacked standing to bring the claim. Nevertheless, the circuit court's error was harmless because Tsukamoto Shareholders failed to show that there was a genuine issue of material fact that Daniel Case committed conspiracy to defraud.

In Case's SJ Motion, he addressed paragraphs 85, 86, and 89 through 104 of Count VI of the Second Amended Complaint to establish that Plaintiffs were unable to show that a genuine issue of material fact existed with regard to the conspiracy-to-defraud claim. In their opposition memorandum, Plaintiffs alleged that Daniel Case had "withheld evidence" in the form of his "own documents, subpoenaed ... in August 2002" that

served to refute each and every material point he had raised in his motion with regard to the above paragraphs. Specifically, Plaintiffs claimed that evidence contradicted Daniel Case's arguments with regard to paragraphs 90 and 91.

In Case's SJ Motion, he argued that there was no evidence that he or CB & L breached "the ethical wall" they had erected to ensure that he was not privy to information that would impermissibly privilege Stephen Case; Stephen Case was "a very strong candidate to acquire Grove Farm"; and in order to get Stephen Case to sign a merger agreement, some confidential information had to be disclosed to him. In their opposition memorandum, Plaintiffs claimed that a memorandum prepared by Daniel Case (attached as Exhibit No. 2) and three e-mails he had either written or received (attached as Exhibit Nos. 5, 8, & 12) showed (1) that Daniel Case had been "given confidential and proprietary information concerning competing offers, the internal voting of the Board, and its 'strike price' "; (2) "the cozy, insider relationship which [Daniel Case] enjoyed with [Cribley] and [Klebahn]" that contradicted Daniel Case's contention that he and Former Directors had agreed to maintain arm's-length discussions throughout the sales negotiations; and (3) how Former Directors gave Daniel Case advantages denied to other bidders, such as "cooperation from management, access to confidential information regarding its [sic] competitors, complete confidentiality, favorable terms and conditions, fast track approval, and the exclusive opportunity to use the Honu agreement as a template."

Exhibit No. 2, which Plaintiffs alleged was a memorandum prepared by Daniel Case on September 23, 2000, "one day after he executed the confidentiality agreement and the board [sic] purportedly waived the conflict of interest," provided in relevant part: "A $27M offer came in last Friday from an unknown entity which wanted 180 days for due diligence with no forfeiture." Plaintiffs argued that there was no way Daniel Case could have provided the due diligence necessary to obtain information regarding the offer on his own in one day. Plaintiffs alleged that, in fact, Klebahn had provided the information regarding the competitor's $27 million offer, but Plaintiffs provided no evidence in support of this claim.

Exhibit No. 5, an e-mail from Stephen Case to Agee, dated September 28, 2000, provides in relevant part:

> [Grove Farm] is an operating business but it's [sic] principal asset is 22,000 acres of land on Kauai. My father knows this asset well because he grew up on Grove Farm plantation land (the company treasurer was his father) and his law firm has represented them for quite some time.

> The likely selling price is $25 million, plus the assumption of $65 million in bank debt.

> . . . .

> But it feels like a smart thing to do and is thus something I want to pursue. But if we do it, we have to move quickly. Other possible buyers are circling (one apparently lobbed in a higher $27 million offer a few days ago) and the sellers seem predisposed to sell to us and willing to sign a binding deal right now, but have asked for a commitment by tomorrow to a non-binding agreement. . . ."

Plaintiffs argued that the e-mail was "chock-full of confidential [Grove Farm] information" that "was given to Stephen Case to provide him with a competitive advantage over others and to ensure that he would be the successful purchaser."

Exhibit No. 8, an e-mail from Agee[9] to Stephen Case, dated September 28, 2000, provides in relevant part:

> **I just got off the phone with [Daniel Case]. The Board wants to work with you. The other offer for $27 million has a six months due diligence period** and there is a sense of urgency by the Board to move more quickly. The offer by Honu which just fell through, was for $23.9 million. **[Daniel Case] feels we need to be close to $25 million in order to close off a potential dispute by a Shareholder/Board Member** who wants to carve out a piece of land in exchange for his shares.

---

**9.** "ALPS LLC was managed by Ka Poʻe Hana LLC, of which the president was [Agee] and the owners were Mr. and Mrs. Stephen Case." *Sheehan*, 114 Hawaiʻi at 381, 163 P.3d at 184.

**The rest of the Directors have indicated if our price is at $25 million, they will vote down the dissenting Director.**

(Emphasis added.) Plaintiffs claimed that the emphasized portions of the e-mail constituted "hard and irrefutable evidence that [Klebahn], in conjunction with its counsel [Cribley], was resigned to selling [Grove Farm] to Stephen Case at a price which was not the result of any arms-length [sic] negotiations." Plaintiffs maintained that the e-mail demonstrated that Klebahn had picked the purchase price "out of thin air" and Former Directors had "no intention of engaging in a bidding war or actually seeking the highest price." Plaintiffs also inferred from the e-mail that Daniel Case had given Agee confidential information Daniel Case had received from Klebahn and Cribley, which information Daniel Case should not have been privy to given the conflict of interest it created, but which he nevertheless accepted without question.

Exhibit 12, an e-mail from Agee to Stephen Case, dated October 11, 2000, provided the following in relevant part:

[Daniel Case] and I spent the past two days in due diligence, touring every acre of the Grove Farm property and meeting with management.

Given a long-term perspective, I feel $26,000,000 is a reasonable price to pay for all the outstanding shares of Grove Farm plus the assumption debt of $62 million. The price of our offer is $1 million higher than we previously thought because we learned from the current CEO, [Klebahn], that there is a credible offer on the table from a competing group for $25.0 million. [Klebahn] has been very forthcoming with us and it is clear that he prefers to have you as the buyer. At the same time, he needs to fulfill his fiduciary responsibilities to [Grove Farm's] shareholders. [Klebahn] feels an offer of $26.0 million will close out the competition and win the day for us.

Plaintiffs argued that the e-mail provides "hard, contemporaneous and irrefutable evidence of a conspiracy between [sic] [Klebahn], [Cribley] and [Daniel Case] to ensure that Stephen Case purchased [Grove Farm] at the lowest possible price. By providing this information to [Daniel Case], [Klebahn] assured that there would be no competitive bidding."

Plaintiffs claimed that a fax transmittal dated October 5, 2000 from Daniel Case to Agee refuted the arguments in Case's SJ Motion regarding paragraph 90 in the Second Amended Complaint. The fax provides in pertinent part:

[Cribley] **gave me two memos to assist us with due diligence** and an additional memo setting forth the proposed land exchange program created to satisfy one of the most troublesome shareholders who effectively blocked Scott Blum's proposal because he wanted to trade his shares for land.

[Klebahn] **suggests that a purchase price a little higher than $23.9M would leave Guy without support and then we could merge him out.** [Cribley] **thinks Guy is enough of a maverick to try and stop any sale** without a land exchange program and that **sale of the lots Jim things [sic] are wanted by Guy ... are not integral to the rest of Grove Farm** so that such a sale would reduce Steve's investment without serious loss.

(Emphasis added.) Plaintiffs alleged that the emphasized portions of the e-mail proved that "there was no ethical wall separating [Daniel Case] from his partner [Cribley]" because the evidence revealed that Cribley provided Daniel Case "not only with memoranda designed to 'assist' with due diligence," but "his own professional impressions of one of the key board members" and "[t]his insight assisted [Daniel Case] in diffusing and isolating director Combs to ensure the lowest price possible."

Even viewing the evidence in the light most favorable to Plaintiffs, *Nuuanu Valley Assoc.*, 119 Hawai'i at 96, 194 P.3d at 537, the evidence presented in the opposition memorandum to Case's SJ Motion did not show that there was a genuine issue of material fact that Daniel Case conspired with Grove Farm to fraudulently induce Grove Farm shareholders into selling their shares for less than fair market value.

### c. Punitive Damages

 Punitive damages are a remedy. *See, e.g., Masaki v. Gen. Motors Corp.,* 71 Haw. 1, 6, 780 P.2d 566, 570 (1989) (holding that punitive damages "are awarded only when the egregious nature of the defendant's conduct makes such a remedy appropriate"). "[A] claim for punitive damages is . . . purely incidental to a separate cause of action." *Ross v. Stouffer Hotel Co. (Hawai'i), Ltd.,* 76 Hawai'i 454, 466, 879 P.2d 1037, 1049 (1994). Hence, we need not address whether Plaintiffs had standing to request punitive damages.

### 8. Motion to Compel

 Tsukamoto Shareholders maintain the circuit court erred in denying their Motion to Compel because Former Directors failed to establish that their communications with CB & L constituted privileged legal advice and not business advice.

On May 21, 2004, Plaintiffs filed their Motion to Compel, in which they moved for an order compelling "defendants" to produce, *inter alia,* documents Plaintiffs had requested in a First Request for Production of Documents (First Documents Request) that was directed only to Grove Farm Company. In the First Documents Request, Plaintiffs had asked for the following:

1. All documents provided to Messrs. Cohen and Connell,[10] or any other attorney, paralegal, or representative of the Morrison Foerster law firm.

2. All documents received from Messrs. Cohen and Connell, or any other attorney, paralegal, or representative of the Morrison Foerster law firm.

3. All documents identified in your response to Plaintiffs' Second Request for Answers to Interrogatories to [Grove Farm Company].

4. All documents which you relied upon in responding to Plaintiffs' Second Request for Answers to Interrogatories to [Grove Farm Company].

Plaintiffs argued that "defendants" would not likely meet their burden of proving that the documents were privileged. Plaintiffs argued in the alternative that the "crime-fraud exception"—which "holds that communications made between an attorney and his client, for the purpose of furthering the commission of a future or present crime or fraud, are not protected from disclosure"—applied because Plaintiffs had claimed in the Second Amended Complaint that they were defrauded. Last, Plaintiffs maintained that even if the privilege had attached, it did not apply to Combs, who was entitled to review the documents pursuant to his status as a former Grove Farm board member.

Grove Farm Company and Former Directors filed a memorandum in opposition, in which they argued that "[i]n response to [the First Documents Request], which sought communications between the two law firms providing legal advice to Grove Farm leading up to the merger transaction, Grove Farm [Company] withheld *five* documents, all of which were appropriately described on a privilege log provided to Plaintiffs' attorney." (Emphasis in original.) Grove Farm and Former Directors attached the log of the privileged documents and Cribley's Declaration, in which Cribley described the privileged documents, to their opposition memorandum. Grove Farm Company and Former Directors further argued that "[a]ll of the documents withheld reflect confidential communications between Grove Farm's lawyers made for the purpose of facilitating the rendition of legal services to Grove Farm." Grove Farm Company and Former Directors maintained that the crime-fraud exception did not apply because Plaintiffs had not met their burden of showing that the communications reflected in the documents furthered the alleged fraud. Last, Grove Farm Company and Former Directors contended that Combs was not entitled to review the documents because he did not seek them based on his role as a corporate director, but to vindicate his personal rights.

Plaintiffs filed a reply to the memorandum in opposition to the Motion to Compel.

---

**10.** Messrs. Cohen and Connell of the law firm of Morrison Foerster were retained as special counsel by Grove Farm to assist CB & L in advising Grove Farm regarding the sale of Grove Farm.

The circuit court appointed a Discovery Master to assist in the resolution of the issue regarding the First Documents Request. On November 3, 2004, the Discovery Master filed an Order Denying in Part Plaintiffs' Motion to Compel Production of Documents, in which the Discovery Master found that

based on the privilege log provided to Plaintiffs and the Declaration of [Cribley] submitted in opposition to Plaintiffs' Motion, the five withheld documents are protected by the attorney-client privilege and need not be produced. Moreover, the Discovery Master finds that the attorney-client privilege is properly asserted with respect to the request of [Combs] for these documents, notwithstanding that he is a former director of Grove Farm. *See e.g., In re Hutchins,* 216 B.R. 11 ([Bkrtcy. ]E.D.Ark.1997). Finally, the Discovery Master finds that Plaintiffs have not met their burden of establishing the applicability of the crime fraud exception. Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion seeking to compel the production of the five withheld documents is DENIED without prejudice to Plaintiffs' right in the future to attempt to establish the applicability of the crime fraud exception.

In *DiCenzo v. Izawa,* 68 Haw. 528, 723 P.2d 171 (1986), the Hawai'i Supreme Court stated:

The [attorney-client] privilege … may be invoked to prevent the disclosure of "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." [HRE Rule] 503(b)…. A proper application of the codified privilege … "requires preliminary judicial inquiry into the existence and validity of the privilege, and the burden of establishing this rests with the claimant." *Sapp v. Wong,* [62 Haw. 34, 38, 609 P.2d 137, 140 (1980) ] (citations omitted); *see also* E. Cleary, [*McCormick on Evidence* ] § 88, at 208 [ (3d ed.1984) ]. "An *ipse dixit* claim of privilege" clearly does not suffice. *Sapp v. Wong,* 62 Haw. at 38, 609 P.2d at 140. Otherwise, meaningful inquiry into the existence of an attorney-client relationship, which "turns

largely on the client's subjective belief that it exists," *In re McGloth[l]en,* 99 Wash.2d 515, 522, 663 P.2d 1330, 1334 (1983), and the character of the communication, which must be intended as confidential, would be foreclosed. *Sapp v. Wong,* 62 Haw. at 39, 609 P.2d at 141 (citation omitted).

*Id.* at 535–36, 723 P.2d at 175–76 (footnote and brackets in original omitted).

In *Sapp,* 62 Haw. at 38–39, 609 P.2d at 140, the Hawai'i Supreme Court stated the following with regard to the attorney-client privilege:

The attorney-client privilege authorizes a client to refuse to disclose and to prevent others from disclosing certain communications between attorney and client. To invoke the privilege, the party asserting it must establish that the communication occurred in the manner as follows:

(1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 Wigmore, Evidence, § 2292 (McNaughton rev.1961).

Because the privilege works to suppress otherwise relevant evidence, the limitations which restrict the scope of its operation, above summarized by Wigmore, must be assiduously heeded. *E. v. E.,* 76 Misc.2d 2, 349 N.Y.S.2d 623 (1973).

Based on our review of the privilege log and Cribley's Declaration submitted in opposition to Plaintiffs' Motion to Compel and for the reasons given by the Discovery Master in his order denying in part the Motion to Compel, the Discovery Master did not abuse his discretion by ruling that the five withheld documents were protected by the attorney-client privilege and need not be produced.

### 9. Other Discovery Motions

Tsukamoto Shareholders contend the circuit court erred in denying their Motion to Set Aside and their Rescissory Damages Dis-

covery Motion because they maintain that they made a prima facie case for punitive damages and rescissory damages prior to the discovery cut-off.

### a. Discovery Request Re Former Directors' Net Worth

On February 14, 2006, Tsukamoto Shareholders served a First Request for Production of Documents and a Second Request for Answers to Interrogatories on each of the Former Directors (collectively, Net Worth Documents Request), seeking information relating to Former Directors' individual net worth and financial background. In the First Request for Production of Documents, Tsukamoto Shareholders requested the following:

1. All of your personal tax returns, including all schedules and attachments, for the years 2000 through the present.

2. All partnership, llc [sic] or subchapter S corporate returns for which you are a partner, member, or stockholder.

3. All trust instruments where you have a beneficial interest of any kind, whatsoever.

4. All stock certificates, notes, accounts receivables or any other such financial instruments which you own or have a beneficial interest in.

5. All deeds for real property which you own.

6. All mortgages for which you are either the mortgagee or mortgagor.

7. Any other documents which refer, relate, or concern your net worth.

Tsukamoto Shareholders later claimed that the information was relevant and probative to their claim for punitive damages and on the issue of whether Former Directors received compensation or reward from "Mr. Case" after the sale of Grove Farm.

By letter dated February 22, 2006, Former Directors sought the Discovery Master's assistance in resolving the issue of whether Former Directors were "entitled to a protective order with respect to their personal financial information until Plaintiffs [had] made a *prima facie* showing of entitlement to punitive damages." On March 14, 2006, the Discovery Master filed an order granting in part Former Directors' motion for protective order. The Discovery Master found the following with regard to the Net Worth Documents Request:

2. [Tsukamoto Shareholders] at this time have failed to make the requisite showing to require [Former Directors] to provide financial information in connection with a claim for punitive damages and [Former Directors] need not respond to [Tsukamoto Shareholders'] discovery requests served on February 14, 2006.

The Discovery Master finds that [Former Directors] are entitled to a protective order with respect to [Tsukamoto Shareholders'] February 14, 2006 discovery requests seeking financial information. The Discovery Master is not convinced that the denial of [Former Directors'] motion for summary judgment on Plaintiffs' fraud claims alone establishes that Plaintiffs have made a *prima facie* showing on those claims, and the Plaintiffs have not otherwise made a *prima facie* showing on their claims for punitive damages based on the record presently before the Discovery Master. Moreover, the discovery requests seek far more information than a statement of the [Former Directors'] net worth, which statement could be quickly obtained upon a determination that the jury would consider punitive damages. Accordingly, the Discovery Master grants [Former Directors'] request for a protective order that they need not respond to [Tsukamoto Shareholders'] [Net Worth Documents Request] served on February 14, 2006. This determination is make [sic] without prejudice and further is not intended to address the propriety of the discovery of financial information that may be relevant to issues other than punitive damages.

On April 12, 2006, Tsukamoto Shareholders filed their Motion to Set Aside, in which they moved "to set aside the portion of the Discovery Master's Order . . . blocking them from discovery of [Former Directors'] individual net worth." Former Directors filed a memorandum in opposition, and Tsukamoto Shareholders filed a reply.

On May 17, 2006, the circuit court filed an order denying the Motion to Set Aside. The circuit court also ordered that Tsukamoto Shareholders would have

> leave to serve upon [Former Directors] a request for production of documents and a request for answers to interrogatories with respect to certain financial information related to their claims on or before 4:30 p.m., on May 1, 2006, and that [Former Directors] shall make good faith efforts to respond to the request for production of documents on or before May 8, 2006, and the request for answers to interrogatories on or before May 15, 2006.

By letter dated July 26, 2006, Tsukamoto Shareholders requested that the Discovery Master reconsider his previous order denying the Motion to Set Aside. On August 17, 2006, the Discovery Master filed his decision, again recommending that the motion be denied. The Discovery Master stated that he did

> not believe that Plaintiffs have made a *prima facie* showing on their punitive damages claim. Moreover, even if the Court decides, at trial, that the issue of punitive damages should be submitted to the jury, the only "discovery" that will be required is for each individual [Former Director] with respect to whom punitive damages will be considered to provide a statement of his or her net worth and perhaps tax returns. The Discovery Master sees no need for that information to be provided now.

On September 6, 2006, the circuit court filed an order denying Tsukamoto Shareholders' requests for discovery regarding Former Directors' net worth. The circuit court further ordered "that, should the Court determine that the issue of punitive damages may be submitted to the jury, Plaintiffs may request from [Former Directors], upon reasonable notice, statements of their net worth and other evidence as the Court may order."

In *Dunlea v. Dappen*, 83 Hawai'i 28, 39 n. 12, 924 P.2d 196, 207 n. 12 (1996), the Hawai'i Supreme Court stated the following with regard to whether a party's assets are discoverable, absent a judgment that he or she is liable for punitive damages:

We generally agree with the trial court that discovery of a defendant's assets is not appropriate "until there's a prima facie showing in discovery that you are going to get to a jury on punitives." Although a prima facie showing necessarily precedes a judgment on liability for punitive damages, the trial court has discretion to fashion appropriate orders and procedures to avoid prejudice to the defendant. For example, the court may allow discovery of [the defendant's] assets, subject to a protective order (*e.g.*, allowing discovery of the information, but subject to specific instructions that the information is to be provided to the attorney only and shall not be divulged to anyone, including the attorney's client, until such time as the trial court lifts the protective order), and/or the court may bifurcate the issues of liability and damages so that evidence of [the defendant's] financial condition is not admissible until the jury has determined whether [the plaintiff's] claim was timely brought and whether [the defendant] is liable. *See generally*, J. McLoughlin, Annotation: *Necessity of Determination or Showing of Liability for Punitive Damages Before Discovery or Reception of Evidence of Defendant's Wealth*, 32 A.L.R.4th 432 (1984).

In the instant case, Tsukamoto Shareholders argue that disputed issues of material fact existed as to their punitive damages claim because the circuit court granted partial summary judgment in their favor on Count III and allowed Count II to go to the jury. We take this to mean that because the circuit court found in its Amended Order that Tsukamoto Shareholders had "demonstrated as a matter of law that [Former Directors] had a duty to exercise informed judgment and failed to exercise informed judgment in recommending to shareholders that they approve the sale of Grove Farm to" ALPS, Tsukamoto Shareholders thereby made a prima facie showing on their punitive damages claim. As we have discussed, the circuit court erred by granting the Business Judgment Rule Motion and improperly made the above finding. See Part III.A. Nevertheless, even if the circuit court had not erred by making the

finding, the finding in and of itself would not constitute a prima facie showing of punitive damages.

Plaintiffs' punitive damages claims related to all counts in the Second Amended Complaint. In *Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17, 780 P.2d 566, 575 (1989), the Hawai'i Supreme Court stated that to prove he or she is entitled to punitive damages, a plaintiff "must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." The circuit court's finding regarding Former Directors' failure to exercise informed judgment would not have met the standard enunciated in *Masaki.*

Last, as Cross–Appellants point out in their opening brief, this point is moot because the punitive damages claim did not go to the jury.

The circuit court did not abuse its discretion by denying the Motion to Set Aside.

### b. Rescissory Damages Discovery Motion

■ Tsukamoto Shareholders argue that they made a prima facie case for a rescissory damages claim because "the issue of [Former Directors'] loyalty" ultimately went to the jury.

On July 24, 2006, Tsukamoto Shareholders filed their Rescissory Damages Discovery Motion, requesting an order "permitting them to conduct discovery related to, and relevant on, rescissory damages"—specifically, "discovery of information concerning any increase in value of [Grove Farm Company] post-sale through the present." (Footnote omitted.)

On August 11, 2006, Former Directors filed a memorandum in opposition to the Rescissory Damages Discovery Motion. They argued that Tsukamoto Shareholders were not entitled to rescissory damages because a court may award such "only to redress an adjudicated breach of the duty of

loyalty" and Tsukamoto Shareholders had not claimed breach of that duty and had not "pled rescission or rescissory damages as a remedy." Former Directors argued in the alternative that Tsukamoto Shareholders had waived their right to rescissory damages because Tsukamoto Shareholders had excessively delayed pursuing that remedy.

On August 15, 2006, Tsukamoto Shareholders filed a reply memorandum.

On September 13, 2006, the circuit court filed an order denying the Rescissory Damages Discovery Motion; however, the court provided "that should the Court determine that the issue of rescissory damages may be submitted to the jury, [Tsukamoto Shareholders] may serve discovery requests upon [Grove Farm Company] for such information as the Court may deem appropriate on the issue of rescissory damages." The circuit court did not explain upon what basis it denied the motion.

■ "[R]escissory damages function to put a party in the same financial position it would have occupied prior to the initiation of a transaction which is found to be invalid or voidable" and "is applied when equitable rescission of a transaction would be appropriate, but is not feasible." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1144 (Del. Ch.1994).

■ "In order to be equitably appropriate, rescissory damages must redress an adjudicated breach of the duty of loyalty, specifically, cases that involve self dealing or where the board puts its conflicting personal interests ahead of the interests of the shareholders." *Strassburger*, 752 A.2d at 581. Rescissory damages are only appropriate when plaintiffs can demonstrate that the "defendant fiduciaries unjustly enriched themselves by exercising their fiduciary authority deliberately to extract a personal financial benefit at the expense of the corporation's shareholders." *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 698 (Del.Ch.1996).

Tsukamoto Shareholders argue that they made a prima facie case for a rescissory damages claim because "the issue of [Former Directors'] loyalty" ultimately went to the

jury. However, in its order, the circuit court provided that *"should the Court determine that the issue of rescissory damages may be submitted to the jury,* Plaintiffs may serve discovery requests upon [Grove Farm Company] for such information as the Court may deem appropriate on the issue of rescissory damages." (Emphasis added.) The issue of rescissory damages did not go to the jury because the jury determined that Former Directors had not breached their duties to Grove Farm stockholders.

Given the foregoing, the circuit court did not abuse its discretion by denying the Rescissory Damages Discovery Motion.

### 10. Final Judgment on Count III

Tsukamoto Shareholders contend the circuit court erred in entering final judgment on Count III of the Second Amended Complaint in favor of Former Directors. Tsukamoto Shareholders argue that the jury's determination that "the sale was ultimately fair in both terms and price" did not change the fact that based on the circuit court's order granting the Business Judgment Rule Motion, "[Former Directors] failed to exercise due care and act with informed judgment."

On May 4, 2007, Sheehan filed a Motion for Entry of Final Judgment (Sheehan's Motion for Entry of Final Judgment), in which he argued that his proposed final judgment should be entered by the circuit court because the proposed final judgment submitted by Grove Farm Company and Former Directors failed to set forth that the court had entered partial summary judgment in favor of Tsukamoto Shareholders and against Former Directors on Count III of the Second Amended Complaint.

On May 4, 2007, Grove Farm Company and Former Directors filed a Motion for Entry of Final Judgment (Former Directors' Motion for Entry of Final Judgment), in which they argued that judgment should be entered in their favor on Count III of the Second Amended Complaint. Daniel Case joined in the motion.

Sheehan filed a "reply" to Former Directors' Motion for Entry of Final Judgment, and Grove Farm Company and Former Directors filed an opposition memorandum to Sheehan's Motion for Entry of Final Judgment.

In the Amended Final Judgment, the circuit court entered judgment in favor of Former Directors and against Sheehan on Count III of the Second Amended Complaint.

As we have discussed, the circuit court erred by granting the Business Judgment Rule Motion. See Part III.A. Therefore, we need not address this point.

### 11. Sheehan's Costs Motion

Tsukamoto Shareholders contend the circuit court erred in denying Sheehan's Costs Motion because Sheehan prevailed on Count III.

Sheehan's Costs Motion was filed on June 8, 2007. Daniel Case filed an opposition memorandum, arguing that the motion failed to specify against whom the taxation of costs was directed and that it could not be against him because he had prevailed against all Plaintiffs. Grove Farm Company and Former Directors also filed an opposition memorandum, and Sheehan filed a reply.

On July 27, 2007, the circuit court filed an order denying Sheehan's Costs Motion. The court found the following:

> [Sheehan] claims to be the prevailing party on Count III, and therefore entitled to recover his costs in this action, based on the [Amended Order]. However, as the Court has previously made clear, the Amended Order did not establish liability. The effect of the Amended Order was to shift to [Former Directors] the burden to show the entire fairness of the ALPS transaction to the shareholders of Grove Farm. Based on the jury's determination that [Former Directors] satisfied that burden, [Sheehan] failed to establish liability on Count III, and therefore is not the prevailing party on Count III.

Given our holding that the circuit court erred in granting the Business Judgment Rule Motion, see Part III.A, the court did not err by denying Sheehan's Costs Motion.

## 12. Motion for New Trial

Tsukamoto Appellants argue that the circuit court erred in denying Sheehan's Motion for New Trial because Sheehan prevailed on Count III, which the Amended Final Judgment should have reflected and which entitled Sheehan to costs.

On June 8, 2007, Sheehan filed his Motion for New Trial, in which he argued:

> First, [HRCP Rule] 54(d) required this Court to specify the facts deemed established (that [Former Directors] failed to exercise due care and act with informed judgment) and conduct the trial accordingly. Instead of specifying the facts established at summary judgment and presenting them to the jury, this Court expunged the record at trial.
>
> Second, this Court's decision at [Former Directors'] urging not to allow a jury instruction that [Former Directors] had failed to exercise due care and act with informed judgment was prejudicially insufficient and led the jury to believe that [Former Directors] acted appropriately and properly in connection with the marketing and sale of Grove Farm. The jury was never informed that [Former Directors'] conduct fell below the applicable standard of care. This omission unfairly impacted and undermined [Sheehan's] case. It was the basis for the jury's decision that [Former Directors] acted in good faith, were loyal, and obtained the best price and terms for the stock.

Grove Farm Company and Former Directors filed a memorandum in opposition, and Sheehan filed a reply.

On July 27, 2007, the circuit court filed an order denying the Motion for New Trial.

Given our holding that the circuit court erred by granting the Business Judgment Rule Motion, see Part III.A, we need not address this point.

## 13. Costs to Daniel Case and Former Directors

Tsukamoto Shareholders and Shareholders both contend the circuit court erred by awarding costs to Daniel Case and Former Directors.

On June 15, 2007, Grove Farm Company and Former Directors filed a Motion for Taxation of Costs, pursuant to HRCP Rule 54(d).[11] They argued they were entitled to costs because they were the prevailing parties in this case, "having obtained a judgment in their favor or a dismissal as against all of the Plaintiffs, on all of the claims."

On June 27, 2007, Tsukamoto Shareholders filed a memorandum in opposition to the motion.

On August 15, 2007, the circuit court filed a Judgment on Taxation and Assessment of Costs, which provides, in relevant part, the following:

> IT IS HEREBY ORDERED, ADJUDGED and DECREED that Judgment is hereby entered in favor of [Grove Farm Company], for itself and as the successor in interest to [ALPS Acquisition], [Former Directors], and against Plaintiffs listed below, in the amount of $87,634.84. Each of the Plaintiffs is jointly and severally liable

---

11. HRCP Rule 54(d) provides in part:

**Rule 54. Judgments; costs; attorneys' fees.**

. . . .

(d) **Costs; attorneys' fees.**

(1) COSTS OTHER THAN ATTORNEYS' FEES. Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs. . . . Costs may be taxed by the clerk on 48 hours' notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

(2) ATTORNEYS' FEES. (A) Claims for attorneys' fees and related nontaxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.

(B) Unless otherwise provided by statute or order of the court, the motion must be filed and served no later than 14 days after entry of an appealable order or judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought. If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made.

with each of the other Plaintiffs, up to the amounts set forth below.

Plaintiffs Ralph Hart Fisher, Sally W. Fisher, Carla N. Jordan, Catherine Anne Moore–Airth, Guy St. Clair Combs, Robert B. Jordan, Michael T. Jordan, Kristen J. La Dow, Anthony Hart Fisher, Jonathan Fisher, Timothy Wilcox Fisher, Scott Michael St. Clair Combs Trust, Martha Combs Trust, Marion Wilcox Combs, and Guy St. Clair Combs III Irrevocable Trust are each jointly and severally liable with each of the other Plaintiffs for up to $38,873.42.

[Tsukamoto] is jointly and severally liable with each of the other Plaintiffs for up to $61,396.09.

[Sheehan] is jointly and severally liable with each of the other Plaintiffs for up to $87,634.84.

## 1. Prevailing Party

■ Shareholders maintain they should not be liable for Former Directors' costs because Former Directors did not prevail against Shareholders for purposes of HRCP Rule 54(d) in this case. We disagree.

Plaintiffs filed their Complaint on November 29, 2002; First Amended Complaint on January 14, 2003; and Second Amended Complaint on April 3, 2003. As the instant case was proceeding, Shareholders (except for Ralph Hart Fisher and Sally Fisher) and additional plaintiffs filed a Verified Complaint in *Combs v. Case Bigelow & Lombardi*, Civ. No. 05–1–0166, on November 29, 2005, in the circuit court, against Stephen Case, ALPS LLC, ALPS Acquisition, The Stephen M. Case Revocable Trust, Ka Poʻe Hana LLC, Grove Farm Company, Former Directors, CB & L, Daniel Case, Cribley, Dennis Lombardi, and Todd Tanaka. The plaintiffs in *Combs* alleged Breach of Fiduciary Duty, Failure to Act in Good Faith for the Benefit of Shareholders and Company, Failure to Exercise Informed Judgment, Negligence/Gross Negligence, Fraud/Misrepresentation, Conspiracy to Defraud, and Punitive Damages.

On March 9, 2006, Tsukamoto Shareholders filed a Motion to Sever, asking the circuit court to sever them from Shareholders because Shareholders intended to move to consolidate the instant case with *Combs* and Tsukamoto Shareholders were not parties to *Combs* and were not interested in becoming parties to *Combs*.

On April 19, 2006, the circuit court filed an order granting the Motion to Sever, setting the trial date for Tsukamoto Shareholders, and denying Shareholders' and Former Directors' motions to consolidate.

On December 1, 2006, Former Directors filed a motion to dismiss without prejudice Shareholders' claims against Former Directors (Motion to Dismiss Shareholders' Claims) because Shareholders had "elected not to pursue their remaining claims against [Former Directors] in this case, and instead to pursue identical claims against [Former Directors] (and others) in [*Combs*]." Former Directors noted that Shareholders had "not participated in this case for any purpose since March 2006."

On February 13, 2007, the circuit court filed an order granting the Motion to Dismiss Shareholders' Claims, without prejudice to Shareholders' rights to bring their claims in *Combs*.

In their Motion for Taxation of Costs, Grove Farm Company and Former Directors argued that they were entitled to costs because, inter alia, they had prevailed against Shareholders as a result of the circuit court's dismissal of Shareholders' claims without prejudice to Shareholders pursuing those claims in *Combs*.

On appeal, Shareholders argue that Former Directors did not prevail against Shareholders in the instant case because the circuit court dismissed Shareholders' claims against Former Directors only as a result of Tsukamoto Shareholders filing the Motion to Sever and the circuit court did not enter a final judgment on the merits. Shareholders contend the circuit court's order to Shareholders to pay Former Directors' costs was premature because Shareholders' claims against Former Directors had not yet been decided in *Combs*.

In *Sheehan*, this court stated:

The Hawai'i Supreme Court stated in *Wong [v. Takeuchi,* 88 Hawai'i 46, 961 P.2d 611 (1998)]:

> Usually the litigant in whose favor judgment is rendered is the prevailing party. Thus, *a dismissal of the action, whether on the merits or not, generally means that defendant is the prevailing party.* There is no requirement that the judgment in favor of the prevailing party be a ruling on the merits of the claims.

[*Id.*] at 49, 961 P.2d at 614 (internal quotation marks, citation, and ellipsis omitted; emphasis added). . . . The holding of *Wong* is clear on its face: any dismissal, regardless of basis, generally renders the defendant the prevailing party for purposes of awarding costs (an attorneys' fees).

114 Hawai'i at 395, 163 P.3d at 198.

Given the foregoing, the circuit court did not abuse its discretion in granting Former Directors and Grove Farm Company's Motion for Taxation of Costs.

## 2. Case's Costs Motion

Shareholders contend the circuit court erred in granting Case's Costs Motion, with the exception of transcript costs and filing fees, because Daniel Case requested costs for photocopies, courier/messenger, facsimile, telephone, depositions, travel, postage, and scanning that are attorney's fees, not costs, according to HRCP Rule 54(d)(1). Shareholders cite to federal cases stating that such out-of-pocket costs are part of attorneys' fees. HRCP Rule 54(d)(1) provides in relevant part that "[e]xcept when express provision therefor is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs . . . ."

In Case's Costs Motion, filed June 14, 2007, Daniel Case cited to HRS § 607–9 (1993) and HRCP Rule 54(d)(1) as authority for an award of costs. In his reply memorandum in support of his motion, he amended the amount requested for travel so that he requested the following costs:

| | |
|---|---|
| Photocopies: | $ 957.94 |
| Third Party Photocopies: | $ 87.28 |
| Courier/Messenger: | $ 272.67 |
| Facsimile: | $ 36.00 |
| Long Distance Telephone: | $ 20.80 |
| Transcripts: | $ 505.07 |
| Filing Fees: | $ 20.00 |
| Depositions: | $ 1,061.90 |
| Travel: | $ 7,354.92 |
| Postage: | $ 7.22 |
| Scanning: | $ .25 |
| **TOTAL** | $10,324.05 |

On July 19, 2007, the circuit court filed an order granting Case's Costs Motion, in which the court ordered Plaintiffs to pay to Daniel Case $10,324.05 in costs, for which Plaintiffs would be jointly and severally liable. On September 6, 2007, the court filed its Judgment on Taxation and Assessment of Costs, which incorporated by reference the order granting Case's Costs Motion.

This case is a Hawai'i case, and Hawai'i law, not federal law, applies. HRS § 607–9 provides in relevant part:

**§ 607–9 Cost charges exclusive; disbursements.**

> All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs. In determining whether and what costs should be taxed, the court may consider the equities of the situation.

Therefore, under HRS § 607–9, the circuit court did not abuse its discretion by granting Case's Costs Motion.

▆▆▆ However, Daniel Case was not entitled to reimbursement for messenger costs totaling $110.00 as such costs are considered part of office overhead. *County of Hawai'i v. C & J Coupe Family Ltd. P'ship,* 120 Hawai'i 400, 409, 208 P.3d 713, 722 (2009). The circuit court should have awarded Daniel Case $162.67 in courier costs and nothing for messenger costs.

## V.

We affirm the Amended Final Judgment filed on June 1, 2007 and the Judgment on Taxation and Assessment of Costs filed on September 6, 2007 in the Circuit Court of the Fifth Circuit provided that the award of costs to Daniel Case is reduced to $10,214.05.